**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

DAVID FREDERICK,                    *
                                    *
            Plaintiff,              *
                                    *
        v.                          *        CV 113-176
                                    *
DEMOND BROWN, individually and      *
in his capacity as an officer       *
with the Augusta-Richmond           *
County Sheriff's Department,        *
et al.,                             *
                                    *
            Defendants.             *

---

**O R D E R**

---

Plaintiff David Frederick alleges Augusta, Georgia[1] and eight named officers of the Richmond County Sheriff's Office ("RCSO"), among others unnamed, deprived him of his First, Fourth, Fifth, Thirteenth, and Fourteenth Amendment rights and violated various state laws when he was arrested, purportedly upon falsified evidence and with excessive force, for violating the local juvenile curfew ordinance. AUGUSTA-RICHMOND COUNTY CODE § 3-1-2. Three groups of defendants now move for complete or partial dismissal: (1) Augusta, Georgia, through Deke Copenhaver, individually and in his official capacity as Mayor (Doc. 21); (2) Ronald Strength, who formerly held

---

[1]     Mr. Frederick names "Augusta-Richmond County" in the Complaint. The proper name of the consolidated government entity, however, is "Augusta, Georgia." 1997 Ga. Laws 4024. Moreover, the consolidated government "follow[s] the law and rules of tort liability applicable to counties in Georgia." 1996 Ga. Laws 3607.

the office of Sheriff (Doc. 12); and (3) the RCSO Defendants, which include Sheriff Richard Roundtree and his deputies (the "deputy Defendants" or "RCSO deputies") (Doc. 35). The Court will consider each motion in turn in Part III, infra.

## I. BACKGROUND

### A. The Augusta Juvenile Curfew Ordinance

In 2008, "to deter juvenile delinquency and juvenile victimization," the Augusta-Richmond County Commission enacted a juvenile curfew ordinance ("the Ordinance") that makes it unlawful for "any minor under the age of eighteen (18) years to loiter, wander, stroll or play in or upon the public streets, highways, roads, alleys, parks, playgrounds or other public grounds, public places, public buildings, places of amusement, eating places, vacant lots or any other place in Augusta-Richmond County, unsupervised by an adult" between the hours of midnight and 5:00 AM on Fridays and Saturdays,[2] subject to certain exceptions. AUGUSTA-RICHMOND COUNTY CODE § 3-1-2. Among those exceptions is "[w]hen a minor is accompanied by his or her parent, guardian or other adult person having the lawful care and custody of the minor." Id. § 3-1-2(a). The Ordinance further exempts attendance or direct travel to and from "an activity involving the exercise of first amendment rights of free speech, freedom of assembly or free exercise of religion." Id. § 3-1-2(d). Adults are also subject to regulation, as the

---

[2]     On any weekday the curfew is in place between 11:00 PM and 5:00 AM.

2

Ordinance makes it "unlawful for the parent, guardian, or other person having custody or control of any child under the age of eighteen (18) to permit, or by insufficient control, to allow, such a child to be in or upon the public streets" during the controlled hours. Id. § 3-1-3.

## B.   Mr. Frederick's Arrest & Suit

According to the Complaint, Mr. Frederick received permission from his mother to attend Augusta's First Friday event, a monthly arts festival, in June 2010 with his cousin, Brad Tucker, who was 18-years-old. (Compl. ¶¶ 26-28, 38.) Mr. Frederick was 16 on the night of the incident. (Id. ¶ 36.) During the previous month's First Friday event, African-American youths "were involved in illegal activity that damaged property and caused personal injury." (Id. ¶ 29.)

While walking on Broad Street after midnight, thereby triggering the Ordinance, several RCSO deputies began to pursue a group of "black male subjects" who were "yelling and chanting." (Id. ¶¶ 39, 41, 42, 46.) Deputy Demond Brown reported that a fellow deputy put the group under a spotlight, and he witnessed Mr. Frederick attempt "to separate himself." (Id. ¶¶ 48-50.) Defendant Brown also purportedly saw Mr. Frederick throw something on the ground. (Id. ¶ 55.) Moreover, Mr. Frederick appeared to be a minor to the deputy Defendants. (Id. ¶ 44.) Thus, "[u]nder color of authority of enforcing the County's curfew ordinance,"

"one or more" RCSO deputies confronted Mr. Frederick and Mr. Tucker. (Id. ¶¶ 42, 51-54, 56.) Defendant Brown first grabbed Mr. Tucker, learned that he was over 18, and "used profane language to try to get [him] . . . to leave." (Id. ¶¶ 51, 53, 54.) After asking Mr. Frederick's age, Defendant Brown "told [Mr. Frederick] that there was a curfew and that he was going to jail." (Id. ¶ 57, 59.) Mr. Tucker then informed Defendant Brown "that he was an adult and that he was with [Mr. Frederick] and he was in charge of [Mr. Frederick]," but Defendant Brown "refused to listen." (Id. ¶¶ 60, 61.) Another deputy "grabbed" Mr. Tucker and told him to "[g]et the f*** back unless you want to go to jail." (Id. ¶ 62.) Officer Brown proceeded to search Mr. Frederick's person, to place him in handcuffs, and to transfer custody to Deputy Rachel Hardin for transport. (Id. ¶¶ 63, 64, 67, 69, 71.)

On the way to the police car, Defendant Hardin "began to yell loudly," and "one or more Defendants" then "tackled" Mr. Frederick to the ground. (Id. ¶¶ 72-74.) "The Defendants" punched, kicked, and hit him. (Id. ¶ 76.) Mr. Frederick received several blows to his head, and "one or more of the Defendants" "ground [his] head into the pavement," causing a permanent scar. (Id. ¶¶ 79, 85, 86.) Mr. Frederick thereafter spent time in an outdoor holding area (id. ¶ 87), but it is unclear whether he was issued a citation of any sort or was convicted of any misconduct. "There were other young African American males taken to the [same] holding area[,]" and "[t]here were arrest and seizures of many minors that night, who

were taken to a holding area without proof or evidence that the minor was not accompanied by an adult[.]" (Id. ¶¶ 88, 91.)

Mr. Frederick maintains that none of the deputies on the scene asked him whether he was accompanied by an adult or otherwise conducted a "reasonable inquiry" into whether Mr. Tucker was an "authorized adult." (Id. ¶¶ 45, 58, 59, 94, 97, 100.) He further expresses that he "had the right to self-defense" and the "right to resist" in response to Defendants' unlawful arrest and use of force. (Id. ¶¶ 80, 81, 83, 84.)

Mr. Frederick turned 18 on September 23, 2011, and filed suit on September 22, 2013, one day before the expiration of the limitations period. (Id. ¶¶ 9, 10.) As a result of this incident, he alleges that he "has suffered and will with reasonable certainty continue to suffer physical and emotional pain." (Id. ¶ 104; see also id. ¶¶ 86, 189.) Accordingly, Mr. Frederick seeks compensatory, special, and punitive damages, as well as "[d]amages for injuries caused by deprivation of Constitutional rights." (Id. at 24, ¶¶ a, b, d, e.) He also requests "[i]njunctive and declaratory relief finding the [O]rdinance unconstitutional on it its [sic] face or that its application was unconstitutional, and order prospective relive [sic] against whoever is the Sheriff and Commission to comply with the constitution and laws of the State of Georgia, to prohibit arbitrary deprivation of freedoms guaranteed all without regard to race, or in violation of due process and equal protection." (Id. at 24, ¶ g.)

Mr. Frederick's Complaint garnered three motions to dismiss (Doc. 12, 21, 35), consideration of which was stayed to facilitate the parties' request that Mr. Frederick's facial constitutional challenge to the Ordinance be litigated first. (Doc. 33; see also Doc. 31.) The parties, however, took no action for over a year: they did not engage in any discovery specific to the facial challenge, nor did they file any motions upon which the Court could act. After undertaking a review of the docket, the Court inquired *sua sponte* into whether the facial challenge to the Ordinance is justiciable at all — more specifically, whether Mr. Frederick has standing under each of the theories of invalidation he presented in brief (Doc. 34) and whether his claims are moot because he turned eighteen approximately two years *prior* to filing this suit. With the benefit of oral argument (Doc. 45), the Court declined to address the merits of Mr. Frederick's facial challenge, finding that it could not determine from the evidence before it — the pleadings — whether Mr. Frederick, now 21-years-old, suffered or imminently will suffer an injury under the Ordinance sufficient to ensure that the Court would not be rendering an advisory opinion on the Ordinance's constitutionality. (Doc. 46.) Accordingly, the Court lifted the stay and directed the parties to finalize briefing of the motions to dismiss, all of which are now ripe for review. (Id.)

## II. STANDARDS OF REVIEW

**A. Motion to Dismiss on Jurisdictional Grounds**

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure may be either a "facial" or "factual" attack. Morrison v. Amway Corp., 323 F.3d 920, 924-25 n.5 (11th Cir. 2003). Defendants' motions, as they relate to immunity, are facial attacks on the Complaint because the Court's resolution of the immunity question does not depend on adjudicating the merits of the case. Haven v. Bd. of Trs. of Three Rivers Reg'l Library Sys., No. CV 213-090, 2014 WL 5872671, at *3 (S.D. Ga. Nov. 12, 2014)("In the Eleventh Circuit, the defense of sovereign immunity is not merely a defense on the merits. An assertion of Eleventh Amendment sovereign immunity essentially challenges a court's subject matter jurisdiction.")(citations and internal quotation marks omitted); Johnson v. Georgia, No. 1:13-CV-3155-WSD, 2014 WL 1406415, at *2 (N.D. Ga. Apr. 9, 2014) (treating the state's Rule 12(b)(1) motion to dismiss the plaintiff's § 1983 and state law claims on immunity grounds as a facial attack in the absence of citations to extrinsic evidence by the state). In a facial attack on subject matter jurisdiction, the Complaint's allegations are deemed presumptively truthful, and the "court is required merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1233 (11th Cir. 2008)

(quoting <u>McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.</u>, 501 F.3d 1244, 1251 (11th Cir. 2007)).

**B.   Motion to Dismiss for Failure to State a Claim**

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant fair notice of both the claim and the supporting grounds. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). To survive a defendant's Rule 12(b)(6) motion to dismiss, therefore, a plaintiff's complaint must include enough "factual allegations to raise a right to relief above the speculative level," and those facts must "state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570. Although a complaint attacked by a Rule 12(b)(6) motion need not be buttressed by detailed factual allegations, the plaintiff's pleading obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Id.</u> at 555. The Rule 8 pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 556 U.S. at 555).

At the same time, a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of circumstances that would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>see also</u>

*Kabir v. Statebridge Co.*, No. 1:11-CV-2747-WSD, 2011 WL 4500050, at
*2 (N.D. Ga. Sept. 27, 2011) (citing *Marshall Cnty. Bd. of Educ. v.
Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)).
At this stage, the Court must accept as true all facts alleged in
the complaint and construe all reasonable inferences in the light
most favorable to the plaintiff. *Hoffman-Pugh v. Ramsey*, 312 F.3d
1222, 1225 (11th Cir. 2002).

## C.   Qualified Immunity

"Qualified immunity offers complete protection for government
officials sued in their individual capacities if their conduct does
not violate clearly established statutory or constitutional rights
of which a reasonable person would have known." *Grider v. City of
Auburn, Ala.*, 618 F.3d 1240, 1254 (11th Cir. 2010) (quoting *Harlow
v. Fitzgerald*, 457 U.S. 800, 818 (1982) and *Vinyard v. Wilson*, 311
F.3d 1340, 1346 (11th Cir. 2002)) (alteration and internal
quotation marks omitted). "Qualified immunity from suit is
intended to allow government officials to carry out their
discretionary duties without the fear of personal liability or
harassing litigation, protecting from suit all but the plainly
incompetent or one who is knowingly violating the federal law."
*Id.* (citation and internal quotation marks omitted). In other
words, "[o]fficials are not liable for bad guesses in gray areas;
they are liable for transgressing bright lines." *Robinson v.*

Payton, No. 14-1962, 2015 WL 3937653, at *3 (8th Cir. June 29, 2015) (citing Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004)).

To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority. Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003) (citing Vinyard, 311 F.3d at 1346). "Once the defendants establish that they were acting within their discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate." Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1303 (11th Cir. 2006) (quoting Lumley v. City of Dade City, Fla., 327 F.3d 1186, 1194 (11th Cir. 2003)). Courts then utilize a two-part framework to evaluate the qualified immunity defense. First, as a threshold inquiry, the Court addresses whether the plaintiff's allegations, if true, establish a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). If the facts, construed in the light most favorable to the plaintiff, show that a constitutional right has been violated, then the Court asks whether the right violated was "clearly established." Id.

In suits pursued under 42 U.S.C. § 1983, "the qualified immunity inquiry and the Rule 12(b)(6) standard become intertwined." GJR Invs., Inc. v. Cnty. of Escambia, Fla., 132 F.3d 1359, 1366 (11th Cir. 1998), overruled on other grounds as recognized in Randall v. Scott, 610 F.3d 701, 709 (11th Cir. 2010); Wooten v. Campbell, 49 F.3d 696, 699 (11th Cir. 1995) (accord). In order to protect public officials from meritless claims, the

complaint must contain "specific, non-conclusory allegations of fact that will enable the district court to determine that those facts, if proved, will overcome the defense of qualified immunity." Dalrymple v. Reno, 334 F.3d 991, 996 (11th Cir. 2003); see also Randall, 610 F.3d at 709-10 ("Pleadings for § 1983 cases involving defendants who are able to assert qualified immunity as a defense shall now be held to comply with the standards described in Iqbal. A district court considering a motion to dismiss shall begin by identifying conclusory allegations that are not entitled to an assumption of truth — legal conclusions must be supported by factual allegations."); Staco v. Miami-Dade Cnty., 536 F. Supp. 2d 1301, 1304 (S.D. Fla. 2008) ("[A] claim can be dismissed where a plaintiff pleads facts or makes admissions that demonstrate that a defense is applicable on the face of the pleadings.")(citing Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1022 (11th Cir. 2001)). Thus, "[i]f a defendant asserts a qualified immunity defense in a Rule 12(b)(6) motion to dismiss, the Court should grant qualified immunity if the plaintiff's complaint fails to allege a violation of a clearly established constitutional or statutory right." Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1300 (11th Cir. 2007) (citing Williams v. Ala. State Univ., 102 F.3d 1179, 1182 (11th Cir. 1997) (per curiam)).

### III.  DISCUSSION

Mr. Frederick has alleged virtually every possible variation of a § 1983 claim, as well as numerous state law claims, against Defendants. For the sake of clarity, the Court will, at the outset of its analysis of each group's motion, either outline what it understands his claim to be or set forth all relevant allegations so that they may be considered in their totality.

**A.  Augusta, Georgia, through its Mayor Deke Copenhaver (collectively, "Augusta") (Doc. 21)**

The Court tangentially addressed Count I in its May 7, 2015 Order (Doc. 46), but it extends that discussion here.  Mr. Frederick asserts that the Ordinance, on its face, violates the First Amendment, as well as the Fourteenth Amendment's due process guarantee that prohibits overly vague laws.  (<u>See</u> Compl. ¶¶ 107-14.)  To be successful on Count I, there must be no construction of the Ordinance that could result in a constitutional application. <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987).  In the same count, Mr. Frederick states, without factual support, that the Ordinance was unconstitutionally applied.[3]  (Compl. ¶ 106.)  Augusta

---

[3]    The majority of the relevant facts pertaining to Mr. Frederick's as applied challenge appear in Count II, which the Court dismisses, <u>infra</u>, as a result of Mr. Frederick's failure to respond.  Nevertheless, "[a]s applied challenges . . . look not to how a law may be interpreted, but instead to how a government has administered the law." <u>Miata v. City of Daytona Beach</u>, No. 6:14-CV-1428-ORL-31, 2015 WL 506287, at *1 (M.D. Fla. Feb. 6, 2015).  Unlike a licensing or permitting scheme administered directly by the government, Augusta does not implement, execute, or enforce the Ordinance and, accordingly, any as applied claim against it fails as a matter of law.  <u>See</u> <u>Grech v. Clayton Cnty., Ga.</u>, 335 F.3d 1326, 1330 (11th Cir. 2003) (en banc) ("Under either avenue [of proving <u>Monell</u> liability], a plaintiff (1) must

responds only that Mr. Frederick has failed to state a claim, arguing in one paragraph — without a single citation to legal authority — that the Ordinance is not vague or overbroad as a matter of law. (Augusta Br., Doc. 21, at 8.) Augusta has not sufficiently supported its motion, and the Court will not endeavor to undertake such a rigorous and lengthy analysis on its behalf. Accordingly, Augusta's motion to dismiss Count I is **DENIED**.[4]

Apart from Count I, Mr. Frederick's § 1983 claims against Augusta are not well-defined. The following paragraphs represent the totality of the "factual" allegations against Augusta:

- "By inference and upon information and belief, decisions were made and action taken by the Defendant Richmond County through its Commission . . . who made a conscious decision to use officers . . . to enforce the Augusta-Richmond County Curfew ordinance in such a manner that it would foreseeably cause the deprivation of the rights of persons like the Plaintiff, even in deliberate indifference to the terms of the ordinance" (Compl. ¶ 31);

---

show that the local governmental entity, here the county, *has authority and responsibility over the governmental function in issue* and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue.") (emphasis added). The Eleventh Circuit Court of Appeals could not be more emphatic about the relationship between sheriffs, deputies, and county government entities: "counties have no authority or control over, and no role in, Georgia sheriff's law enforcement function. Counties do not grant sheriffs their law enforcement powers, and neither prescribe nor control their law enforcement duties and policies. Counties also have no role in the training or supervision of the sheriff's deputies. . . . Georgia courts also speak with unanimity in concluding that a defendant county cannot be held liable for the tortious actions of the sheriff or his deputies in performing their law enforcement activities." Id. at 1336-37.

[4] In its May 7, 2015 Order, the Court held that Mr. Frederick's claim for declaratory and injunctive relief as to Count I was moot at the time he filed suit. (Doc. 46 at 10, 19.)

- "Orders established . . . an intentional practice of enforcement . . . that would be in deliberate indifference to the rights of persons . . . ." (Id. ¶ 32);

- "Upon information and belief, under the direction of the Defendant Commission and/or the Defendant Sheriff Strength deputies were instructed to arrest persons who were [sic] appeared to be minors . . . ." (Id. ¶ 35);

- "Upon information and belief, there were specific orders, by or caused to be issued by or approved by one or more policy makers, such as . . . the Commission . . . , establishing an intentional choice by policy makers to have individual officers arrest any person who looked like a minor and who was not near someone who was clearly many years older" (Id. ¶ 90); and

- "Sheriff Strength, individually, or in conjunction with one more Commission members, or John Doe private citizens, intentionally caused . . . officers on the streets to arrest persons similar to Plaintiff, under circumstances similar to those in which Plaintiff was arrested, in disregard of the protections of the [O]rdinance . . . ." (Id. ¶ 103 (emphasis added)).

Based on these allegations, which are conclusory and in many instances do not reflect constitutionally infirm conduct, Mr. Frederick names Augusta in three additional counts. In Count II, Mr. Frederick complains about the "intentional mis-application of the [O]rdinance's terms" by Augusta and seeks a declaration that Augusta is liable for "having caused an unlawful arrest with the vague terms of 'supervised' by an 'adult.'" (Id. ¶¶ 117-19, 125.) In Count III, Mr. Frederick appears to contend that Augusta promulgated or maintained an unlawful policy requiring arrests under the Ordinance without regard to objective, exculpatory evidence readily available to law enforcement at the time of

14

arrest. (Id. ¶¶ 129, 130.) Finally, in Count IV, Mr. Frederick similarly asserts that there was an "order, policy and plan from policymakers" that the deputies should "apply the curfew ordinance and select for seizure groups of 'black suspects.'" (Id. ¶¶ 138, 152.)

Augusta moved to dismiss the claims against it on several grounds. Specifically, it argues (1) Mr. Frederick's Complaint is an impermissible shotgun pleading for which Mr. Frederick's counsel has been repeatedly chastised (see Augusta Br. at 2); (2) Mr. Frederick fails to allege sufficient facts under the Twombly and Iqbal "to raise [his] right to relief above the speculative level," Twombly, 550 U.S. at 555 (id. at 8-10); (3) the law is abundantly clear that a county cannot be held liable for acts of the sheriff or his deputies over which it has no control (id. at 10-11); (4) Mayor Copenhaver is entitled to qualified immunity (id. at 12); and (5) the Ordinance is not overbroad or vague as a matter of law (id. at 5-8). Mr. Frederick answers only one of these arguments — the last — in two attempts at response. (See generally Docs. 34, 47.) As to the balance, he states that "[b]esides Defendant Augusta's claim that the curfew ordinance is constitutional, their other claims for why the complaint should be dismissed only concern Defendant Deke Copenhaver in his individual capacity."[5] (Doc. 47 at 1.)

---

[5] Here Mr. Frederick reverses course and clarifies that he "is not asserting any claims against Defendant Copenhaver in his individual capacity"

Mr. Frederick's interpretation of Augusta's Motion to Dismiss is inaccurate. Moreover, Mr. Frederick's failure to respond indicates that he does not oppose dismissal on several of the identified grounds. See LR 7.5, SDGa. The Court has no qualms in utilizing this rule as Mr. Frederick is and always has been represented by an attorney and, on May 7, 2014, the Court issued an Order specifically granting Mr. Frederick fourteen days to respond to the remainder of arguments raised in Augusta's Motion to Dismiss that he failed to address in his first response brief. (Doc. 46 at 19-20.) He declined to take advantage of this opportunity. Accordingly, the Court **GRANTS IN PART** Augusta's motion (Doc. 21) and **DISMISSES WITH PREJUDICE** Counts II, III, and IV against it.

## B. Ronald Strength (Doc. 12)

Mr. Frederick also seeks to hold Ronald Strength, former Sheriff of Richmond County, liable in his official and individual capacities for violations of the First, Fourth, Thirteenth, and Fourteenth Amendments, as well as state law, which allegedly arose out of Mr. Frederick's arrest. Mr. Strength moves to dismiss each cause of action alleged against him pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim based upon the Supreme Court's decisions in Twombly and Iqbal. (Strength Br.,

---

(Compl. at 1), notwithstanding the caption Mr. Frederick selected for this case — "AUGUSTA-RICHMOND COUNTY, through Deke Copenhaver, in his individual and official capacities as Mayor of Augusta-Richmond County, through its Commission" — and numerous allegations therein that plainly include individual capacity claims (id. ¶¶ 22, 128, 129).

Doc. 12, at 1.) He also moves to dismiss the official capacity claims on grounds of Eleventh Amendment immunity and state sovereign immunity, and the individual capacity claims on grounds of qualified immunity and official immunity. (Id.) Utilizing the motion to dismiss standards articulated in Part II, supra, the Court now addresses Mr. Strength's specific contentions.

Preliminarily, the Court notes that Mr. Strength is not the current sitting Sheriff of Richmond County and the claims asserted against him in his official capacity, therefore, cannot stand.[6] The Court **DISMISSES WITH PREJUDICE** Count III against Mr. Strength in its entirety, as well as Counts II and IV to the extent they seek to hold Mr. Strength liable in his official capacity. The Court will address any official capacity claims that apply to Sheriff Roundtree as the proper, substituted party in Part III.C.7, infra. See FED. R. CIV. P. 25(d).

The Court's first step in evaluating Mr. Strength's motion to dismiss is "to identify the precise constitutional violation charged and to explain what the violation requires." Franklin v. Curry, 738 F.3d 1246, 1250 (11th Cir. 2013). Mr. Frederick's Complaint makes this simple, threshold task challenging in an unfortunately familiar way.[7] His persistent use of passive voice in

---

[6]      Kentucky v. Graham, 473 U.S. 159, 166 n.11 (1985). Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, when a public officer "ceases to hold office" during the course of litigation, his "successor is automatically substituted as a party."

[7]      See, e.g., Pearson v. Augusta, No. 1:14-cv-110, Doc. 23; Gibbons v. McBride, No. 1:14-cv-00056, Doc. 38; Smith v. Augusta-Richmond County, No.

sentences without a subject noun often leads to more questions. Mr. Frederick clarifies in brief, however, that Mr. Strength was deliberately indifferent to his constitutional rights as evidenced by Mr. Strength's failure to train the deputies. (<u>See,</u> <u>e.g.</u>, Pl.'s Strength Resp., Doc. 23, at 11 ("[F]or the same reasons given above to think that Plaintiff has met the plausibility standard in pleading that Defendant Strength is liable, or more specifically that his inadequate training or instructing of officers caused the violations of constitutional right of Plaintiffs as a matter of deliberate indifference to those rights, also applies to or includes the [T]hirteenth and [F]ourteenth Amendment rights of Plaintiff as an African American."); <u>id.</u> at 18 ("Claim II – [as to First and Fourteenth Amendments] asserts liability against the Sheriff individually as a supervisor for deliberate indifference in failing to train the officers in a way to implement that did not violate the First Amendment."; <u>id.</u> at 23 ("Claims II and III (Fourth Amendment – no probable cause to arrest, therefore no need to use force, failure to train to apply the exceptions to adequately protect First Amendment rights).").) The Court thus moves forward under a failure to train theory. As the nature of

<hr>

1:10-cv-00126, Docs. 33, 51; <u>see also</u> <u>Allen v. City of Grovetown</u>, No. 1:10-CV-00022, Doc. 21.

the allegations in Counts II and IV are nearly identical, the Court will address them concurrently.[8]

All the "factual" allegations relevant to Mr. Strength's individual liability in assessing his Rule 12(b)(6) motion are as follows:

- "By inference and upon information and belief, decisions were made and action taken by . . . Defendant Sheriff Strength and other policy-makers who made a conscious decision to use officers . . . to enforce the . . . [O]rdinance in such a manner that it would foreseeably cause the deprivation of the rights of persons like the Plaintiff, even in deliberate indifference to the terms of the [O]rdinance" (Compl. ¶ 31);

- "Based on inferences from the manner in which the [O]rdinance was enforced that night as to Plaintiff and similarly situated minors, orders that established an intentional practice of enforcement that night, that would be in deliberate indifference to the rights of persons and cause the deprivations of their freedoms under the First, Fourth, Thirteenth and Fourteenth Amendments" (Id. ¶ 32);

- "Upon information and belief, under the direction of . . . the Defendant Sheriff Strength[,] deputies were instructed to arrest persons who were [sic] appeared to be minors at the June 2010 First Friday, who were in public, past the curfew time" (Id. ¶ 35);

- "Upon information and belief, the individual officers . . . acting individually or jointly and in concert *with orders from superiors* such as Lt. [Gay] or Defendant Strength[,] arrested Plaintiff" (Id. ¶ 77) (emphasis added);

- "Upon information and belief, there were specific orders, by or caused to be issued by or approved by one or more policy makers, such as Defendant Sheriff Strength, . . . establishing an intentional choice by

---

[8]     Indeed, Mr. Frederick states that his response to Mr. Strength's argument about the sufficiency of Claim II also applies to Claim IV. (Pl.'s Resp. at 10-11.)

policy makers to have individual officers arrest any person who looked like a minor who was not near someone who was clearly many years older" (Id. ¶ 90); and

- "The Defendant Sheriff Strength . . . individually caused the individual front line officers on the streets to arrest persons similar to Plaintiff, under circumstances similar to those in which Plaintiff was arrested, in disregard of the protections of the [O]rdinance" (Id. ¶ 103).

In Claim II, which Mr. Frederick asserts against Mr. Strength "as a policy-maker . . . because of the intentional mis-application of the [O]rdinance's terms . . . that were applied in a vague and unconstitutional manner," he adds the following:

- "Upon information and belief, line officers *were instructed* to seize and/or arrest persons who might be minors if the [sic] was evidence that they were with or possibly supervised by an adult, and to ignore the claims of minors and some adults that they were supervising the adult [sic]" (Compl. ¶ 120 (emphasis added);

- "Upon information and belief[,] line officers *were told* to seize or arrest groups of persons that might have minors in the groups without regard to whether a given minor was supervised by an adult" (Id. ¶ 121 (emphasis added));

- "As a matter or [sic] individual and joint causation, because of the unconstitutional and arbitrary application of the [O]rdinance, resulting in the seizure and arrest of minors and persons who might be minors without regard to and in deliberate indifference to evidence that the seized person was supervised by an adult[,] Plaintiff and others similarly situated were unlawfully arrested by an unconstitutional application of the [O]rdinance" (Id. ¶ 123); and

- "The County should be liable under Claim II . . . if it is shown that the Defendant Sheriff and other policymakers put a plan in practice that night that caused officers . . . to apply the [O]rdinance as to Plaintiff . . . by ignoring evidence that the minor was supervised by an adult" (Id. ¶ 126).

In Claim IV, Mr. Frederick contends that "the Defendant Sheriff" "caus[ed] line officers to select 'black suspects' for possible arrest." (Id. ¶ 138; see also id. ¶ 152.) The only non-conclusory allegation is that "[i]nstruction and supervision was given to subordinates *by one or more of policymakers of Defendant Sheriff* to seize and arrest persons who might be minors who were African Africans [sic], even though supervised by an adult, without first having objective evidence of particularized and individualized evidence of probable cause or suspicion justifying seizure." (Id. ¶ 143.)

As discussed above, a government official acting within his discretionary authority is immune from suit unless the official's conduct violates "'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Hope v. Pelzer, 536 U.S. 730, 738 (2002) (quoting Harlow, 457 U.S. at 818). Mr. Strength has asserted, and Mr. Frederick has conceded, that he was acting within his discretionary authority when training and supervising the deputies. (Strength Br. at 11; Pl.'s Strength Resp. at 16.) Thus, Mr. Frederick must show that Mr. Strength is not entitled to qualified immunity for the claims that remain pending against him in his individual capacity. See Hope, 536 U.S. at 736. The Court considers next whether the factual allegations in the Complaint, if true, establish a constitutional violation by Mr. Strength and whether the constitutional right allegedly

violated was clearly established at the time. Gonzalez, 325 F.3d at 1234 (citing Vinyard, 311 F.3d at 1346).

"Supervisory liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation."[9] Braddy v. Fla. Dep't of Labor & Emp't Sec., 133 F.3d 797, 802 (11th Cir. 1998) (citing Brown v. Crawford, 906 F.2d 667, 671 (1990)) (first alteration in original; second alteration omitted). A causal connection exists (1) when "a history of widespread abuse" put the supervisor on notice of the need to correct the constitutional deprivation, and he failed to do so; (2) when the supervisor's custom or policy resulted in deliberate indifference to constitutional rights; or (3) when facts support the inference that the supervisor directed his subordinates to act unlawfully or knew that they would and failed to stop them. Gonzalez, 325 F.3d at 1234 (quoting Brown, 906 F.2d at 671) (other citations omitted). The standard for supervisory liability is "extremely rigorous." Braddy, 133 F.3d at 801-02.

---

[9] There are no allegations in the Complaint that Mr. Strength personally participated in Mr. Frederick's arrest or that he was even on the scene that night. Thus, the Complaint states a claim, if at all, against Mr. Strength in his supervisory capacity only. For purposes of Mr. Strength's motion, therefore, the Court will assume — without deciding — that the deputies violated Mr. Frederick's rights. See Dalrymple v. Reno, 334 F.3d 991, 995 (11th Cir. 2003) (articulating the methodology for resolving claims of supervisory liability); McDaniel v. Yearwood, No. 2:11-CV-00165-RWS, 2012 WL 526078, at *15 (N.D. Ga. Feb. 16, 2012).

Mr. Frederick invokes the second theory of causation. He premises Mr. Strength's liability on a policy or custom of inadequate training that is supported only by evidence of the events surrounding Mr. Frederick's conduct and arrest on June 4-5, 2010. (See Pl.'s Strength Resp. at 5 ("Taking all the circumstances into consideration[,] the plan to enforce the curfew ordinance, motivated by the problems that arose in the prior First Friday, could not have been implemented but for Strength's deliberate indifference. . . . It was obvious and public knowledge from the events that occurred during the First Friday for May, 2010, when African American youths were involved in illegal activity damaging property and causing personal injury, that something had to be done to prevent it during the June, 2010, First Friday. It is highly likely that Defendant Strength, implemented a plan to enforce the County curfew ordinance . . . .").) He further contends that he "has sufficiently alleged that Defendant Strength is liable, based on a failure to adequately train, which constitutes a policy[,]" because "the need to train officers with respect to enforcing the curfew ordinance, specifically the exceptions . . . , is so obvious, that failure to do so is deliberate indifference to constitutional rights." (Pl.'s Strength Resp. at 8-9.) He continues, "[t]he implausibility of Strength adequately training officers stems from the fact that properly trained officers (with respect to [the Ordinance's exceptions]) would render the [O]rdinance useless in situations like First

Friday where minors are in close proximity to adults or relatives —
and Defendant Strength would not intend to do a useless thing."
(Id. at 10.) In other words, if Mr. Strength properly trained his
officers about the Ordinance's provisions, not a single arrest
could be made because surely one of the exceptions would apply
during an event like First Friday.

The Court disagrees. To the extent the Complaint does set
forth a failure to train claim,[10] it is insufficiently pleaded.
There is no allegation of a "history of widespread abuse" related
to enforcement of the Ordinance that would put Mr. Strength on
notice to take some corrective action. There is no allegation that
Mr. Strength established or ratified a custom[11] of targeting
African-American minors through enforcement of the Ordinance or
otherwise failing to adhere to the rules concerning lawful arrests
when enforcing the Ordinance. Mr. Frederick does not allege what
training the deputies did receive, if any, or what training or
supervision was lacking or needed. More importantly, other than
Mr. Frederick's own arrest, there is not another incident of

---

[10] Mr. Frederick's clarification of his claims is dubious, as the word
"train" appears only once in the entire 191-paragraph Complaint in the
context of the use of excessive force. (See Compl. ¶ 73 ("[A]s planned or
trained, one or more Defendant tackled Plaintiff.").) Only in brief does he
assert that the deputies "had to be trained to listen to and accept, at face
value the statements of the detained minor or accompanying adult" to
determine whether the exceptions to the Ordinance apply. (Pl.'s Resp. at
23.)

[11] "The Supreme Court has defined the word 'custom' to include 'persistent
and wide-spread . . . practices,' 'permanent and well settled' practices, and
'deeply embedded traditional ways of carrying out policy.'" Murdock v. Cobb
Cnty., Ga., No. 1:12-cv-01743-RWS, 2013 WL 2155465, at *5 (N.D. Ga. May 17,
2013) (citing Fundiller v. City of Cooper City, 777 F.2d 1436, 1442 (11th
Cir. 1996)).

wrongdoing alleged in the Complaint. "Without notice of a need to train or supervise in a particular area a supervisor cannot be held liable for having failed to train or supervise." Larosa v. City of Sweetwater, No. 13-21585-CIV, 2014 WL 235449, at *3 (S.D. Fla. Jan. 22, 2014) (citing Gold v. City of Miami, 151 F.3d 1346, 1351 (11th Cir. 1998)) (alteration and internal quotation marks omitted); see also Gray, 458 F.3d at 1308; Lavassani v. City of Canton, Ga., 760 F. Supp. 2d 1346, 1361-62 (N.D. Ga. 2010) (granting summary judgment to police supervisors on the plaintiff's failure to train claim that arose out of his arrest for obstruction because "a single violation of constitutional rights does not amount to an official policy or custom resulting in the deprivation of an individual's constitutional rights" (citing City of Oklahoma v. Tuttle, 471 U.S. 808, 824 (1985))). Simply, the Complaint's allegations, though replete with buzzwords and legalese, lack all substance.

Although there exists "a narrow range of circumstances that a plaintiff might succeed without showing a pattern of constitutional violations," this scenario only applies where a constitutional violation is "a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Gold, 151 F.3d at 1352 (quoting Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 409 (1997)). "[T]o date, the Supreme Court has given only a hypothetical example of a need to train being 'so obvious' without

prior constitutional violations: the use of deadly force where firearms are provided to police officers." Id. (citing City of Canton v. Harris, 489 U.S. 378, 390 n.10 (1989)). Thereafter, in Gold, the Eleventh Circuit Court of Appeals found the plaintiff's contentions that police officers were inadequately trained and/or supervised regarding a disorderly conduct statute fell "far short of the kind of 'obvious' need for training that would support a finding of deliberate indifference to constitutional rights." Id. (citing City of Canton, 489 U.S. at 396-97); see also Gray, 458 F.3d at 1309 (finding no obvious need to provide *specific* training regarding the detention of students, in addition to general training regarding use of force during detention and arrest). Simply, Mr. Frederick has failed to allege that the type of constitutional violation at issue in this case is the sort of highly predictable consequence of inadequate training that is necessary to state a claim for supervisory liability.

Furthermore, Mr. Frederick acknowledges the lack of factual support for his failure to train claim by stating "Plaintiff should be allowed discovery to develop evidence about actions or inactions taken by Strength as to the training or instruction, long term or short term, about how the County's curfew ordinance should be enforced" and "if evidence of prior incidents of violations of constitutional rights are revealed in discovery, sufficient to have put Defendant on notice, Plaintiff will also seek to show supervisory liability in that fashion." (Pl.'s Strength Resp. at

4, 9; see also id. at 3 ("Although the inference to Defendant Strength's liability from the officers' improper actions is not necessarily in and of itself probable, nor necessarily a 'strong inference,' it is plausible, and a (at least weakly) 'reasonable inference[.]'"); Compl. ¶ 78 ("Plaintiff cannot identify which officers did what and will need depositions of the officers to show not only their joint action, but what might be determined by the fact-finder as a matter of causation to have been an individual action that caused a deprivation of rights.").)  That is not how this works.

"Rebutting qualified immunity imposes more of a burden than stating a claim, . . . and even stating a claim 'does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.'"  Tolbert v. Trammell, No. 2:13-CV-02108-WMA, 2014 WL 3892115, at *9 (N.D. Ala. Aug. 4, 2014) (citing Iqbal, 556 U.S. at 679); see also Gonzalez, 325 F.3d at 1233 ("[Q]ualified immunity is an entitlement not to stand trial or face the other burdens of litigation," and "must be resolved at the earliest possible stage in litigation.") (citations and internal quotation marks omitted). "Pleadings that fail to state a claim are not entitled to discovery to improve their factual foundation." Tolbert, 2014 WL 3892115, at *9 (citing Iqbal, 556 U.S. at 679).  Mr. Frederick has not alleged, much less with plausibility, that Mr. Strength was on notice of a need train his deputies, and accordingly has failed to show the necessary causal connection between him and the allegedly

unconstitutional conduct of the deputies for supervisory liability to be imposed. With such findings, the Court need not consider the second prong of qualified immunity. Mr. Strength's motion to dismiss is **GRANTED** as to Claims II and IV. (Doc. 12.)

Finally, in Count IX, Mr. Frederick (1) cites the Georgia Constitution and O.C.G.A. § 51-1-1 and (2) states that Plaintiff was abused while he was arrested and that "[f]ormer sheriff Defendant Strength, is vicariously liable for the wrongful acts of his deputies." (Compl. ¶¶ 178, 179, 181, 182). The Supreme Court of Georgia has made clear that a sheriff "can only be sued in his *official* capacity under respondeat superior." Seay v. Cleveland, 508 S.E.2d 159, 161 n.1 (Ga. 1998) (citing Gilbert v. Richardson, 452 S.E.2d 476, 484 (Ga. 1994)); see also Nichols v. Prather, 650 S.E.2d 380, 385 n.6 (Ga. Ct. App. 2007). "As to acts or omissions personal to the sheriff, however, he may be sued in his personal capacity and will be protected from such suits only to the extent official or qualified immunity applies." Seay, 508 S.E.2d at 161 n.1.

Neither of these options is available to Mr. Frederick. As previously held, all claims against Mr. Strength in his official capacity must be dismissed as he no longer holds any official office. Moreover, there is not a single allegation in Count IX that relates to any act or omission by Mr. Strength in his personal capacity. The Court therefore **GRANTS** Mr. Strength's motion to dismiss as to Count IX. (Doc. 12.)

**C.    Sheriff Roundtree, the RCSO deputies (Defendants Brown, Gay,[12] Hambrick, Hardin, Saal, and Swint), and John/Jane Doe (Doc. 35)**

The only remaining defendants are those presently associated with the Richmond County Sheriff's Office, all of whom have been sued in both their official and individual capacities. (See Compl. at 1; Doc. 1-2.) These Defendants jointly move to dismiss all claims brought against them on several grounds. First, the RCSO Defendants contend all of Mr. Frederick's official capacity claims are barred by Eleventh Amendment and sovereign immunities. (RCSO Defs.' Br., Doc. 35, at 19-21.) They further claim entitlement to qualified and official immunity for claims asserted against them in their individual capacities. (Id. at 10-18.) Second, Sheriff Roundtree and Lieutenant Gay argue that Mr. Frederick's supervisory claims against them cannot survive the two-prong test espoused in Twombly and Iqbal or the pleading requirements set forth in Federal Rule of Civil Procedure 8. (Id. at 4-7.) The RCSO deputies also contend Mr. Frederick's Equal Protection claim (Count VI) and Excessive Force claim (Count VIII) must fail due to implausibility. (Id. at 7-10.) Finally, the RCSO Defendants assert that Mr. Frederick's claims against the John/Jane Defendants must be dismissed. (Id. at 8.) Again utilizing the motion to dismiss standards articulated in Part II, supra, the Court addresses the RCSO Defendants' arguments in logical fashion.

---

[12]    Mr. Frederick names "LIEUTENANT GRAY" in the Complaint. The parties have acknowledged, however, that the Complaint listed "Lt. Gray" in error and "Lt. Scott D. Gay" is the correct party. (Doc. 9.)

1.  John/Jane Doe Defendants

The RCSO Defendants contend that Mr. Frederick cannot advance any claims against "John and/or Jane Doe" under the Federal Rules. (RCSO Defs.' Br. at 8.) "As a general matter, fictitious-party pleading is not permitted in federal court." Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010); see also Fitzpatrick v. Ga. Dep't of Corr., No. CV 612-022, 2012 WL 5207474, at *8 (S.D. Ga. Sept. 12, 2012), R&R adopted as modified, No. CV 612-022, 2012 WL 5207472 (S.D. Ga. Oct. 22, 2012). A limited exception to this rule exists "when the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage,'" and thus discovery would uncover the unnamed defendant's identity. Richardson, 598 F.3d at 738 (quoting Dean v. Barber, 951 F.2d 1210, 1215-16 (11th Cir. 1992)); Daleo v. Polk Cnty. Sheriff, No. 8:11-CV-2521-T-30 TBM, 2012 WL 1805501, at *4-5 (M.D. Fla. May 17, 2012) (citing Dean, 951 F.2d at 1215-16).

Mr. Frederick failed to respond to the RCSO Defendants' argument on this issue, which indicates that he does not oppose dismissal on these grounds. See LR 7.5, SDGa. Notwithstanding Mr. Frederick's silence, the Court notes that Mr. Frederick merely labels the "John and/or Jane Doe" Defendants as "individual officers or supervisors," "members of the Commission," or even "private citizens." (Compl. ¶¶ 23, 103.) These bare categories "do[] not equate to the real possibility that these unknown individuals' identities will be revealed" during discovery, and the

30

Court will not enable a fishing expedition on account of Mr. Frederick's use of placeholders. See Fitzpatrick, 2012 WL 5207474, at *8. The Court thus **DISMISSES** all claims against "John and/or Jane Doe." The Court **DIRECTS** the Clerk, as well as the parties, to terminate them as Defendants in this case.

2.    Eleventh Amendment and Sovereign Immunity for Official Capacity Claims

The Eleventh Amendment "bars suits brought in federal court when the State itself is sued and when an 'arm of the State' is sued." Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977)). Eleventh Amendment immunity may be asserted not only by state officers and state officials, but by all persons "acting as an 'arm of the State,' which includes agents and instrumentalities of the State." Id. (citing Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429-30 (1997)). The determination of whether a defendant is an "arm of the state" must be assessed "in light of the particular function which the Defendant was engaged when taking the actions out of which liability is asserted to arise." Id. "As the Supreme Court has explained in determining whether a sheriff is a state or county policymaker for purposes of a § 1983 action, the question is not whether [the sheriff] acts for [the state] or [the county] in some categorical, all or nothing manner, but rather whether the sheriff is acting for the state in a particular area, or on a particular issue." Abusaid v.

*Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 405 F.3d 1298, 1303 (11th Cir. 2005) (alteration in original) (internal quotation marks omitted) (citing *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 (1997)).

Thus, to determine whether the defendant, while engaged in the relevant function, acts as an arm of the state, the Court must examine "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders*, 338 F.3d at 1309 (citations omitted). Although the issue of whether an entity is an arm of the state is a question of federal law, a court must first examine state law to define the relationship between the entity being sued and the state itself. See *id.* at 1309 n.10; see also *McMillian*, 520 U.S. at 786.

Since *Manders* was decided in 2003, the relevant Georgia law remains essentially unchanged. Indeed, it is now "insurmountable" that Georgia sheriffs act as arms of the state — not as county officials — and accordingly, the *Manders* factors weigh heavily in favor of Sheriff Roundtree's and the RCSO deputies' immunity. *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1332-40 (11th Cir. 2003) (en banc). The Court, therefore, will not repeat the *Manders* analysis here. See *Hall v. Fries*, No. 7:13-CV-105 HL, 2014 WL 1389063, at *4-5 (M.D. Ga. Apr. 9, 2014); *Scott v. Mercier*, No. 5:06-cv-33, 2007 WL 2728440 (S.D. Ga. Sept. 14, 2007), *aff'd*, 268 F. App'x 872 (11th Cir. 2008); *Lewis v. Wilcox*, No. 3:06-cv-29,

2007 WL 3102189, at *8 (M.D. Ga. Oct. 23, 2007). In sum, Manders and its progeny dictate that where a sheriff and his deputies are performing their official and authorized duties as state actors — i.e. engaged in general law enforcement functions or making arrests pursuant to state law — they are entitled to Eleventh Amendment immunity from a § 1983 claim for money damages or other retrospective relief brought against them in their official capacities. See Manders, 338 F.3d at 132 (holding that a sheriff acted as an arm of the state regarding promulgation of a use-of-force policy at the county jail); see also Scruggs v. Lee, 256 F. App'x 229, 232 (11th Cir. 2007) (concluding that "[a]s employees of the sheriff," deputies, in their official capacities, are also entitled to Eleventh Amendment immunity); Grech, 335 F.3d at 1347 (finding a sheriff acts on behalf of the state "in his function as a law enforcement officer and keeper of the peace in general"); Carter v. Butts Cnty., Ga., No. 5:12-CV-209 LJA, 2015 WL 3477022, at *19 (M.D. Ga. June 2, 2015) (holding the sheriff acted as an arm of the state in maintaining an alleged policy, practice, or custom of failing to discipline his deputies, and that the deputy acted as an arm of the state while making an arrest for burglary and criminal trespass); Hall, 2014 WL 1389063, at *5 (holding the sheriff served as an arm of the state in providing policies and procedures for de-escalation techniques and the use of force with mentally-ill individuals, and finding the deputy also acted as an arm of the state when he participated in a SWAT raid, arising out

of a standoff with a man believed to have thrown a brick through a store window, because such participation "was a law enforcement function that was lawful only because of the authority granted by the state to the Colquitt County sheriff's office"); Muckle v. Robinson, No. 2:12-CV-0061-RWS, 2013 WL 251113, at *4 (N.D. Ga. Jan. 23, 2013) (citing Scott v. Brown, No. 1:11-cv-1811-TWT-JFK, 2012 WL 529983, at *3 (N.D. Ga. Jan. 26, 2012)); McDaniel v. Yearwood, No. 2:11-CV-00165-RWS, 2012 WL 526078, at *8 (N.D. Ga. Feb. 16, 2012) (finding the sheriff acts "acts on behalf of the state when he trains and supervises his deputies" based on the Eleventh Circuit's explanation in Grech, 335 F.3d at 1337, that "counties . . . have no role in the training or supervision of the sheriff's deputies"); Townsend v. Coffee Cnty., Ga., 854 F. Supp. 2d 1345, 1352 (S.D. Ga. 2011) (finding a deputy sheriff acted as an arm of the state while making an investigatory stop and arrest); Lewis, 2007 WL 3102189, at *9 (holding that a sheriff acted as an arm of the state when promulgating use-of-force and seizure policies "in the context of ordinary law enforcement," specifically in relation to an incident where deputies pursued and collided with a speeding motorcyclist); Scott, 2007 WL 2728440, at *3-4 (holding that a deputy was an arm of the state while using force in an attempt to resolve a civil custody dispute, a matter governed by state law); Mladek v. Day, 293 F. Supp. 2d 1297, 1301 (M.D. Ga. 2003) (finding the deputy was wearing a "state hat" at the time of the plaintiff's arrest, arising out of an argument with his wife

outside their home, and insofar as the sheriff was liable for the manner in which the plaintiff was treated by that deputy, the sheriff likewise was wearing a "state hat").

The Court, however, pauses only briefly to consider Mr. Frederick's allegations that the relevant function in this case is enforcement of a *local* Ordinance. Mr. Frederick contends that RCSO, through its policymakers, "put a plan in practice" to effectuate arrests *under the Ordinance* without the proper level of suspicion — that is, "even if the [sic] was evidence that [minors] were with or possibly supervised by an adult, and to ignore the claims of minors and some adults that they were supervising the adult" — and on the basis of race, in contravention of the First, Fourth, and Fourteenth Amendments. (See, e.g., Compl. ¶¶ 120, 121, 126, 143, 152.) The deputy Defendants then carried out that "plan," resulting in Mr. Frederick's arrest.

As the Court must tailor its analysis to the particular function involved,[13] it recognizes that the distinction between enforcement of a state law and a local ordinance is not without significance given the Eleventh Circuit's decision in Abusaid.[14]

---

[13] See Abusaid, 405 F.3d at 1303 (quoting McMillian, 520 U.S. at 785)); Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga, 400 F.3d 1313, 1325 (11th Cir. 2005) (reaffirming that Manders did not decide "that a Georgia sheriff wears a 'state hat' for all functions"); Grech, 335 F.3d at 1331-32 ("Both McMillian and Turquitt . . . remind us that, in examining control, we must consider the particular area or function for which the government official was alleged to be the final policymaker.")(citations omitted).

[14] See also Scott, 2007 WL 2728440, at *4 (finding a sheriff's deputy was an arm of the state while using force in an attempt to resolve a civil custody dispute, and expressly noting that the plaintiff "had not alleged

But it does not find the distinction to be dispositive in this case. In Abusaid, a Florida county, its sheriff, and its fire marshal undertook a series of actions to enforce an ordinance regulating "rave" or "dance halls" (the "Dance Hall Ordinance" or the "Ordinance") against the plaintiff, a private night club owner. 405 F.3d at 1301. The sheriff arrested the plaintiff four times over a two-week span and charged him with a number of criminal violations, including violations of the Dance Hall Ordinance. Id. In holding that the sheriff, acting to enforce the Dance Hall Ordinance, was not an arm of the state entitled to the benefit of Eleventh Amendment immunity, id. at 1313-14, the court emphasized that, unlike in Manders, "the Sheriff plainly was acting pursuant to a grant of authority by the County, codified in a County ordinance," id. at 1304 n.4 (emphasis added). Indeed, the Ordinance expressly assigned the duty of enforcement to the sheriff, id. at 1304, and all four Manders factors compelled the conclusion that the sheriff could not be deemed to be acting under the state's control, id. at 1305-14.

These considerations are not present here. As the Abusaid court noted, Florida law "defines sheriffs and their functions very differently than . . . Georgia." Id. at 1305. "In Georgia, counties . . . do not delegate any of their governmental or police powers to sheriffs. Instead, the sheriffs' authority and duties

_that any County ordinance was implicated, that the Brantley County Board of Commissioners had any control over Deputy Mercier's use of force, or that Mercier's actions were done at the behest of any County official")._

*are derived directly from the State.*" <u>Manders</u>, 338 F.3d at 1310-11 (emphasis added). Because Sheriff Roundtree and his deputies acted as state officials at all relevant times in carrying out their law enforcement activities — notwithstanding the source of the law under which Mr. Frederick's arrest was ultimately made — they are immune in their official capacities. The RCSO Defendants' motion to dismiss, therefore, is **GRANTED** in this respect.

The RCSO deputies further contend that they are entitled to sovereign immunity in their official capacities with respect to Mr. Frederick's state law claims, Counts IX through XII.[15] (RCSO Defs.' Br. at 19-20.) Mr. Frederick represents in brief that he "is not asserting the state law claims against [Defendants Brown, Hardin, Hambrick, Swint, and Saal] in their official capacity." (Pl.'s Resp. RCSO at 15.) Accordingly the Court **DENIES AS MOOT** the RCSO Defendants' motion to dismiss Mr. Frederick's state law claims on sovereign immunity grounds.

3.  <u>Supervisory Claims</u>

The RCSO Defendants contend that the claims asserted against Sheriff Roundtree and Lieutenant Gay do not pass muster under <u>Twombly</u> and <u>Iqbal</u>. (RCSO Defs.' Br. at 5-6.) Specifically, they contend that "not a single wrongful act is attributed to [Sheriff Roundtree] anywhere in Plaintiff's voluminous Complaint." (<u>Id.</u> at

---

[15]    Mr. Frederick's state law claims are unlabeled and misnumbered. The third state law claim, identified as a repeat of "Count IX," shall be designated Count XI for purposes of this Order. The fourth state law claim, identified as a repeat of "Count X," shall be designated Count XII.

5.) The RCSO Defendants also point out that Lieutenant Gay appears only in the recital of facts; no specific claim is levied against him. (Id. at 6-7.)

At the outset, Mr. Frederick represents in brief that he "is not claiming that Defendant Roundtree is liable in his individual capacity," but merely names him for purposes of prospective relief if the course of proceedings deem such relief to be appropriate. (Pl.'s Resp. RCSO, Doc. 48, at 15.) Because Mr. Frederick asserts no supervisory liability claim against Sheriff Roundtree in his individual capacity, the RCSO Defendants' motion to dismiss such a claim is **DENIED AS MOOT**. That leaves Lieutenant Gay. Given the length of Mr. Frederick's Complaint and his incorporation by reference of "each and every allegation" in each and every claim, for the sake of thoroughness the Court outlines the allegations relevant to Lieutenant Gay:

- "Lt. [Gay] is sued individually and in his official capacity *as an officer* with the Augusta-Richmond County Sheriff's Department" (Compl. ¶ 19 (emphasis added));

- "Defendant Brown had been instructed by Lt. [Gay], that when he arrested a minor, that he was to turn the minor over to other officers, who would take the minor to a holding area, where another officer would call the parents to pick up the minor" (Id. ¶ 70); and

- "Upon information and belief, the individual officers, Defendants Brown, Hardin, Hamrick, Saal and Swint, acting individually or jointly and in concert with orders from superiors *such as Defendant Lt. [Gay] or Defendant Strength*[,] arrested plaintiff" (Id. ¶ 77 (emphasis added)).

Lieutenant Gay reappears in Count III, wherein Mr. Frederick states "[t]here is a conflict of interest between the interests of the line officers [sic] Defendants like Brown, Hardin, Hamrick, Saal and Swint, *and potentially Lt. [Gay]*, and the policy-makers and County and those who gave directives to apply the ordinance without regard to evidence that the possible minor was supervised by an adult." (Id. ¶ 132 (emphasis added).) Mr. Frederick clarifies in Count III, however, that it only "is a challenge *against the Defendant Augusta-Richmond County* in an as-applied claim against the Defendant County, and for the actions and inactions of *policy-makers*, like Defendant Sheriff Strength in his official capacity." (Id. ¶ 136 (emphasis added).)

Mr. Frederick has not identified any specific count for which he seeks to hold Lieutenant Gay liable, much less stated a claim for any constitutionally cognizable wrongdoing. In response, Mr. Frederick argues that "a policy maker ordered officers to make arrests under the curfew ordinance . . . , and Lt. Gay was a supervisor involved in directing officers as to the arrests for minors in the night in question, so it is plausible that Lt. Gay directed officers to make arrests under the curfew ordinance at First Friday in June 2010." (Pl.'s Resp. RCSO at 13.) In other words, based solely on the allegation that Lieutenant Gay gave instructions about transporting arrested juveniles during First Friday, the Court should first make the inference that Mr. Frederick intends to assert a claim against Lieutenant Gay in any

count in which the word "superior," "supervisor" or "policymaker" appears, and second, that Lieutenant Gay not only ordered enforcement of the curfew, but did so in a manner that was racially motivated and meant to eschew Fourth Amendment protections.

The Court will not insert Lieutenant Gay's name in every place it conceivably fits, especially as Mr. Frederick makes plain that beyond the sheriff, other policymakers and supervisors are "unknown." (See, e.g., Compl. ¶¶ 78, 138, 143.) If Mr. Frederick wished to assert claims against Lieutenant Gay in his supervisory capacity, he knew how to do so. Lieutenant Gay, therefore, is **DISMISSED** from this case.

### 4. Federal Constitutional Claims

Mr. Frederick has enumerated four federal claims against the RCSO Defendants, purportedly based on the First, Fourth, Fifth, Thirteenth, and Fourteenth Amendments. In Count V, which consists of a *single* substantive allegation, Mr. Frederick states that the RCSO Defendants "ignored evidence that protected the freedom of the Plaintiff to associate with others, under the supervision of an adult, by disregarding evidence that Plaintiff was supervised by an adult, and therefore exempt from the curfew." (Compl. ¶ 155.) In Count VI, Mr. Frederick alleges the RCSO Defendants "used race as a factor in seizing and arresting Plaintiff, where there was no objective evidence that Plaintiff was not being supervised as an adult." (Id. ¶ 158). In Count VII, Mr. Frederick contends

Defendant Brown "created false evidence." (Id. ¶¶ 168, 169.) Finally, in Count VIII, Mr. Frederick asserts that the RCSO Defendants used excessive force in carrying out his arrest. (See id. ¶¶ 173, 174.)

The RCSO Defendants move only to dismiss Counts VI and VIII as insufficiently pleaded, but nonetheless claim entitlement to qualified immunity as to all of Mr. Frederick's federal claims. The Court addresses the RCSO Defendants' challenges to the sufficiency of the pleadings first.

      a.   *Equal Protection Claim (Count VI)*

In Count VI, Mr. Frederick alleges that the RCSO deputies "used race as a factor in seizing and arresting Plaintiff, where there was no objective evidence that Plaintiff was not being supervised by an adult in violation of the First, Fourth, Thirteenth, and Fourteenth Amendments." (Compl. ¶ 158; see also id. ¶ 166 (omitting the Thirteenth Amendment).) He repeats three more times that these Defendants had "no probable cause to seize" (id. ¶¶ 159, 161, 162), and then adds that "[a]ll persons in Georgia are entitled to equal protection and due process under the state and federal constitution" and "[u]nder the Fifth and Fourteenth Amendments" he "could not be deprived of the life and liberty right to resist an unlawful arrest" (id. ¶¶ 164, 165). Ignoring Mr. Frederick's haphazard citation to more than seven sources of law, he emphasizes that he is African-American (id.

¶ 160), and the Court thus understands his claim to be that racial profiling, rather than any sort of reasonable suspicion or probable cause, instigated the entire chain of events.

"The purpose of the Equal Protection Clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (citation and internal quotation marks omitted). Simply, "the Equal Protection Clause requires government entities to treat similarly situated people alike." Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1313 (11th Cir. 2006). Thus, to plead an equal protection claim, a plaintiff must allege that "through state action, similarly situated persons have been treated disparately," Bumpus v. Watts, 448 F. App'x 3, 5 (11th Cir. 2011) (citation omitted), and "put forward evidence that the defendant's actions were motivated by race," Brannon v. Clinton, No. 2:11-CV-43-RWS, 2013 WL 653285, at *10 (N.D. Ga. Feb. 21, 2013) (alteration omitted)(quoting Draper v. Reynolds, 369 F.3d 1270, 1278 n.14 (11th Cir. 2004)).

The RCSO Defendants argue that Mr. Frederick fails to state "that he was situated similarly to persons belonging to a different ethnic group or that the Deputies treated him differently from any members of such a group." (RCSO Defs.' Br. at 7.) According to Defendants, "[m]erely stating that one is a member of a minority

42

group, by itself, is not enough to create a viable Fourteenth Amendment Equal Protection claim." (Id. at 7-8.)

Although Mr. Frederick's Complaint does not identify any other investigatory stop or arrest carried out by the RCSO Defendants in their effort to enforce the Ordinance in June 2010 other than the one involving Mr. Frederick and thus lacks specific comparators, construing the whole Complaint in the light most favorable to Mr. Frederick, the Court finds Mr. Frederick narrowly states a claim for a violation of his Fourteenth Amendment rights. Mr. Frederick alleges that "[t]he general public comes to the event and walk [sic] on the sidewalks and exercise [sic] their First Amendment rights," but that the RCSO Defendants received orders only "to seize and confront African American 'suspects'" for violating the curfew Ordinance given the prior month's unlawful activity that involved African-American youths. (Compl. ¶¶ 28, 29, 136; see also id. ¶¶ 142, 149, 152.) In accordance with those orders, Defendant Brown and other deputies viewed Mr. Frederick "as being part of or associating with a group of 'black suspects'" and then "used race" to enforce the Ordinance in a discriminatory fashion. (See id. ¶¶ 158, 159, 162.) If, at the summary judgment stage, Mr. Frederick can prove that *each* of the RCSO Defendants in fact were motivated by a discriminatory purpose in pursuing and arresting him, circumstantial evidence that others were not treated in the same way may be irrelevant, see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977) (explaining that to

"[d]etermin[e] whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," and whether the impact of official action "bears more heavily on one race than another" merely provides an important *starting point*, as does "[t]he specific sequence of events leading up [to] the challenged decisions" or actions) (citations and internal quotation marks omitted). Therefore, the Court does not find his lack of comparators to be fatal with respect to the instant motion to dismiss.

In the usual course, this finding would not end the Court's inquiry, as the RCSO deputies argue that they are entitled to qualified immunity. However, the entirety of the RCSO deputies' argument on this subject appears to address Mr. Frederick's claims arising under the Fourth Amendment. (See RCSO Defs.' Br. at 12 (lumping Counts V, VI, VII, and VIII together as grounded in Mr. Frederick's claim that they lacked probable cause to arrest).) Accordingly, the Court **DENIES** the RCSO Defendants' motion to dismiss Count VI.

> b.  *Fourth Amendment-Based Excessive Force Claim (Count VIII)*

The RCSO Defendants contend Mr. Frederick's excessive force claim should be dismissed because he "lumps all the defendants together and fails to distinguish their conduct," thereby depriving the RCSO Defendants of adequate notice. (RCSO Defs.' Br. at 8

44

(citing <u>Appalachian Enters., Inc. v. Epayment Solutions, Ltd.</u>, No. 01-CV-011502 (GBD), 2004 WL 2813121, at *9 (S.D.N.Y. Dec. 8, 2004)).) Indeed, Mr. Frederick's allegations are broadly framed over approximately forty paragraphs:

- "Mr. Frederick was confronted by a [sic] one or more of [sic] officers of the Richmond County Sheriff's Office including the defendants Rachel Hardin (Rachel Brooks), Demond Lamont Brown, Phillip W. Hambrick, Jason B. Saal, James M. Swint" (Compl. ¶ 42);

- "Defendant Brown had Plaintiff placed in handcuffs" and then "he was given to a female officer, Defendant Hardin" (<u>Id.</u> ¶¶ 67, 71);

- "Then, as planned or trained, one or more Defendants tackled Plaintiff" (<u>Id.</u> ¶ 73);

- "The Defendants, individually and jointly took Plaintiff to the ground" (<u>Id.</u> ¶ 74);

- "The Defendants, individually and jointly, had control of Plaintiff" (<u>Id.</u> ¶ 75);

- "The Defendants, individually, jointly, and in conspiracy held, punched, kicked and hit Plaintiff" (<u>Id.</u> ¶ 76);

- "Several of the blows from one or more of the Defendants were to Plaintiff's head and were unreasonable" (<u>Id.</u> ¶ 79); and

- "One or more of the Defendants, individually or jointly with the aid of one or more of the if [sic] other Defendants, ground Plaintiff's forehead into the pavement[,]" "which caused and [sic] injury that resulted in a permanent scar" (<u>Id.</u> ¶¶ 85, 86).

The body of Count VIII, which inappropriately "incorporates each and every allegation . . . as if fully stated herein" (<u>id.</u> ¶ 171), adds that "Defendants Brown, Hardin, Hamrick, Swint, Saal and John and Jane Doe officers, individually and jointly used

excessive force in violation of the Fourth Amendment" (id. ¶ 172), "[t]here was no probable cause to arrest Plaintiff and therefore there was no ground to use force" (id. ¶ 173), and "[t]he manner of the seizure and arrest of Plaintiff was done with unreasonable and excessive force" (id. ¶ 174).[16]

---

[16] Mr. Frederick also includes the single allegation that "[o]ne or more Defendants idly stood by and failed to prevent excessive force used against Plaintiff." (Compl. ¶ 176.) Notwithstanding that it is logically impossible for all five Defendants to participate in the abuse, as Mr. Frederick claims infra, and simultaneously "idly st[and] by," Mr. Frederick has failed to set forth adequate facts to support a failure to intervene claim. Compare Duquesne v. City of Miami Beach, No. 12-20575-CIV, 2012 WL 3061603, at *8-9 (S.D. Fla. July 26, 2012) (finding the plaintiff failed to state a claim of excessive force against police officer for failing to intervene because despite allegations of the officer's "general presence" — that she cuffed the plaintiff, put him in the back of the police car, and drove the police car back to the station — the plaintiff failed to plead that the officer was in a position where she could have anticipated and stopped fellow officers from punching the plaintiff in the face while he was handcuffed in the back seat and again at the station), and Johnson v. Boyd, No. 7:11-CV-88 HL, 2012 WL 3555212, at *3 (M.D. Ga. July 12, 2012) (finding the plaintiff failed to allege facts showing that the defendants had the opportunity or capability to intervene, such as the duration of the fight, how quickly the events unfolded, or the position of the non-participants in relation to the plaintiff), R&R adopted, No. 7:11-CV-88 HL, 2012 WL 3561849 (M.D. Ga. Aug. 16, 2012), aff'd in part, vacated in part on other grounds, 568 F. App'x 719 (11th Cir. 2014), and Lewis v. Blue, No. 2:09-CV-862-WKW, 2010 WL 730210, at *6 (M.D. Ala. Mar. 3, 2010) (finding the plaintiff failed to state a claim for a deputy's failure to intervene because the factual allegations "never state that [the deputy] actually witnessed any of the alleged violations, or that she was in a position to intervene;" it was unclear from the Complaint when, if ever, the deputy was even on the scene; and the Complaint did not contain "any allegations at all as to [the deputy's] behavior"), and Schowalter v. Ridge, No. 108-CV-0264-JOF, 2009 WL 812279, at *8 (N.D. Ga. Mar. 27, 2009) (explaining that in cases decided under the Fundiller v. City of Cooper City nonfeasance theory, 777 F.2d 1436, 1441-42 (11th Cir. 1985), "plaintiffs have alleged facts about what the accused officers were doing and where they were physically located during the alleged unconstitutional conduct," and finding the "plaintiff has not alleged any facts about the physical location or circumstances of officers Jordan or Ridge from which the court could determine that Defendants were on the scene with reasonable steps available to them to intervene and refused to do so"), with Gholston v. Humphrey, No. 5:13-CV-444 MTT, 2015 WL 1019924, at *6-7 (M.D. Ga. Mar. 9, 2015) (finding the plaintiff's pro se complaint stated a claim against twelve correctional officers for failing to intervene during three separate beatings where he identified the participants and bystanders in each incident and "[n]one of the[] incidents, as described by Plaintiff, involved only one or a

Mr. Frederick responds that he refers to the deputy Defendants collectively "because they are all alleged to have engaged in identical misconduct of using excessive force against" him. (Pl.'s Resp. RCSO at 11 (citing Oginsky v. Paragon Props. of Costa Rica, LLC, 784 F. Supp. 2d 1353, 1362 (S.D. Fla. 2011)).) Moreover, apparently recognizing that his Complaint is vague, at best, as to which RCSO deputies were even present when excessive force was used, he also argues, albeit unpersuasively, that the RCSO Defendants' answer to Paragraph 75 — they "are without sufficient information to admit or deny the allegation[]" that Defendants' "had control of" Mr. Frederick — affirmatively "place[s] the Defendant officers within proximity of Plaintiff during the material time." (RCSO Answer, Doc. 28, ¶ 75; Pl.'s Resp. RCSO at 12 n.13.)

As a threshold matter, the Court notes that it is unclear whether Mr. Frederick has asserted a discrete constitutional violation at all for the RCSO Deputies' alleged use of force. "[W]here an excessive force claim is predicated solely on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim." Bashir v. Rockdale Cnty., Ga., 445 F.3d 1323, 1332 (11th Cir. 2006). One reasonable reading of Count VIII is that the deputies used excessive force in

---

few blows conducted by a single excessive-force user," thereby giving the bystanders "ample time to intervene if they had wished to do so").

the arrest *because they lacked the right to make the arrest*: "[t]here was no probable cause to arrest Plaintiff and therefore no ground to use force against Plaintiff." (Compl. ¶ 173.) Such a claim would survive or fall on the determination of whether the RCSO Defendants had arguable probable cause to arrest Mr. Frederick for violation of the Ordinance. See Bashir, 445 F.3d at 1332 (reiterating that such a claim "is dependent upon and inseparable from [the] unlawful arrest claim" (citing Jackson v. Sauls, 206 F.3d 1156, 1171 (11th Cir. 2000))). A more strained reading of Count VIII, however, "relat[es] to the manner in which an arrest was carried out" or the "unreasonable quantum of force (i.e., non-de minimis force unreasonably disproportionate to the need) in effecting an otherwise lawful arrest." (Compl. ¶ 174 ("The manner of the seizure and arrest of Plaintiff was done with unreasonable and excessive force."); id. ¶ 175 (stating Mr. Frederick's injuries arise out of "Defendants' use of excessive force *and/or unlawful arrest[] for lack of probable cause*").) Bashir, 445 F.3d at 1332.

Although the Complaint leaves much to be desired from the point of view of precision and clarity, the Court will proceed under the assumption that Mr. Frederick intends to assert both, the discrete claim being stated in the alternative should the Court later decide the deputy Defendants had probable cause to arrest. Construing the Complaint in the light most favorable to Mr. Frederick, the Court finds that he has alleged sufficient facts to state a discrete claim for excessive force against the RCSO

deputies. Mr. Frederick alleges that Defendants Brown, Hardin, Hamrick, Swint, and Saal each tackled him; punched, kicked, and hit him while he was on the ground; and pushed his forehead into the pavement "to punish [him] for trying to resist an unlawful arrest or protect himself." (Compl. ¶¶ 73, 74, 76, 85, 84.) This led Mr. Frederick to have a "permanent scar" and to suffer "mental anguish." (Id. ¶¶ 86, 175.) These alleged facts are not mere legal conclusions.

The RCSO deputies' contention that they "have no reasonable or reliable means of determining which specific acts they are actually being accused of engaging in, and have thus been charged with the burdensome task of defending themselves" is unavailing. (RCSO Defs.' Br. at 9-10.) It is peculiarly within these Defendants' own knowledge whether they were present at the point of Mr. Frederick's arrest, which was initiated by Defendant Brown, and whether they participated in tackling or beating Mr. Frederick upon Defendant Hardin's purported yell or call for assistance when she attempted to secure Mr. Frederick for transport. On the assumption that all the allegations in the Complaint are true, particularly those that place Mr. Frederick face down on the ground under assault, the Court cannot fault Mr. Frederick's "unfamiliarity with [Defendants'] names and faces." (Compl. ¶ 78.) No amount of re-pleading — especially here, without the benefit of discovery (Docs. 31, 33) — would cure such a deficiency. Accordingly, Mr. Frederick has plausibly stated a claim of excessive force against the RCSO

deputies. See Duquesne v. City of Miami Beach, No. 12-20575-CIV, 2012 WL 3061603, at *9 (S.D. Fla. July 26, 2012).

As before, in the usual course this finding would not end the Court's inquiry, as the RCSO deputies argue that they are entitled to qualified immunity. However, the entirety of the RCSO deputies' argument on this subject appears to address whether they lacked probable cause to arrest (see RCSO Defs.' Br. at 12), which is irrelevant to an excessive force claim evoking the Fourth Amendment's protection against the use of an unreasonable quantum of force in effecting an otherwise *lawful* arrest. Accordingly, the Court **DENIES** the RCSO Defendants' motion to dismiss Count VIII.

### 5. Qualified Immunity for Individual Capacity Claims

Although the RCSO Defendants do not move to dismiss Counts V and VII, which appear to be false arrest claims, they raise the defense of qualified immunity as to all Mr. Frederick's federal claims. As described above, to receive qualified immunity, the government official must first prove that he was acting within his discretionary authority. Gonzalez, 325 F.3d at 1234 (citing Vinyard, 311 F.3d at 1346). "Once the defendants establish that they were acting within their discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate." Gray, 458 F.3d at 1303 (quoting Lumley, 327 F.3d at 1194). Courts then utilize a two-part framework to evaluate the qualified immunity defense. First, as a threshold inquiry, the

Court addresses whether the plaintiff's allegations, if true, establish a constitutional violation. <u>Saucier</u>, 533 U.S. at 201. If the facts, construed in the light most favorable to Mr. Frederick, show that a constitutional right has been violated, then the Court asks whether the right violated was "clearly established." <u>Id.</u>

Mr. Frederick does not contest or rebut the RCSO deputies' argument that in carrying out the challenged arrest, they acted in a discretionary capacity. <u>See</u> <u>Crosby v. Monroe Cnty.</u>, 394 F.3d 1328, 1332 (11th Cir. 2004); <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002); <u>Smith v. City of Atlanta, Ga.</u>, No. 1:11-CV-765-TWT, 2011 WL 4500022, at *5 (N.D. Ga. Sept. 27, 2011). As to the second part of the qualified immunity analysis, the RCSO deputies maintain that they acted in compliance with the Fourth Amendment's protections, and Mr. Frederick's allegations, therefore, do not set forth a constitutional violation.

a. *Section 1983 Claims under the Fourth Amendment*

"A plaintiff can show a violation of the Fourth Amendment by showing that he was arrested without probable cause." <u>Lawrence v. Gwinnett Cnty.</u>, 557 F. App'x 864, 870 (11th Cir. 2014) (citing <u>Brown v. City of Huntsville</u>, 608 F.3d 724, 734 n.15 (11th Cir. 2010)). "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a

person of reasonable caution to believe that a criminal offense has been or is being committed." *City of Huntsville*, 608 F.3d at 734 (citing *Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997)). "An officer is entitled to qualified immunity as to a plaintiff's claim that he was arrested without probable cause if the officer shows that he had *arguable* probable cause, rather than actual probable cause. *Lawrence*, 557 F. App'x at 870 (emphasis added)(citing *Grider*, 618 F.3d at 1257). "Arguable probable cause is present where reasonable officers in the same circumstances and possessing the same knowledge could have believed probable cause existed." *Id.* (citation omitted). "This standard permits law enforcement officers to make reasonable mistakes with regard to the existence of probable cause without being held personally liable." *Bradley v. Tucker*, No. 4:14-CV-165, 2015 WL 64944, at *8 (S.D. Ga. Jan. 5, 2015) (citing *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990)); *see also Lawrence*, 557 F. App'x at 870 ("An officer will not be held personally liable where he reasonably, but mistakenly, concludes that probable cause was present.") (citation omitted).

"The Fourth Amendment's freedom from unreasonable searches and seizures [also] encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197 (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)). "The question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer."

_Vinyard_, 311 F.3d at 1347; _see also_ _Lee_, 284 F.3d at 1197 (stating that "to determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand"). "Use of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" _Post v. City of Fort Lauderdale_, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting _Graham_, 490 U.S. at 396).

Generally, "[n]ot only does the right to make an arrest or investigatory stop necessarily carry with it the right to use some degree of physical coercion or threat thereof to effect it, but . . . the typical arrest involves some force and injury." _Reese v. Herbert_, 527 F.3d 1253, 1272 (11th Cir. 2008) (alternation and internal quotation marks omitted) (quoting _Graham_, 490 U.S. at 396, and _Rodriguez v. Farrell_, 280 F.3d 1341, 1351 (11th Cir. 2002)). However, "even _de minimis_ force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect." _Zivojinovich v. Barner_, 525 F.3d 1059, 1071 (11th Cir. 2008) (citing _Bashir_, 445 F.3d at 1332). That is, "[i]f no probable cause authorizes an arrest, _any_ use of force to effectuate the unlawful arrest is a violation of the Fourth Amendment." _Williams v. Sirmons_, 307 F. App'x 354, 360 (11th Cir. 2009) (emphasis in original) (citing _Bashir_, 445 F.3d at 1331–33). Therefore, in the absence of probable cause to arrest, an officer

cannot establish qualified immunity from suit for the use of excessive force in effectuating that arrest. See Thompson v. Mostert, 489 F. App'x 396, 397 (11th Cir. 2012) (affirming denial of summary judgment on qualified immunity as to use of excessive force where officers could not establish arguable probable cause to arrest plaintiff); Reese, 527 F.3d at 1273 (denying summary judgment on qualified immunity as to excessive force claim where, due to the absence of probable cause, [an officer] was not justified in using any force against [the plaintiff]").

"Whether an arresting officer possesses probable cause or arguable probable cause naturally depends on the elements of the alleged crime and the operative fact pattern." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137-38 (11th Cir. 2007) (citation omitted). Arguable probable cause, however, "does not require an arresting officer to prove *every* element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors." Scarbrough v. Myles, 245 F.3d 1299, 1302-03 (11th Cir. 2001) (emphasis added); see also City of Huntsville, 608 F.3d at 735 (accord). "If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply." City of Huntsville, 608 F.3d at 735 (citing Skop, 485 F.3d at 1138); see also Lee, 284 F.3d at 1195-96 ("The validity of an arrest does not turn on the offense announced by the officer at the time of the arrest.") (alteration and citation omitted).

b.  *Analysis*

The Court now turns to the specifics of Mr. Frederick's claims against the RCSO Defendants. As a threshold matter, Mr. Frederick's false arrest claim against Defendants Hamrick, Hardin, Saal, and Swint in Count V must fail. According to the Complaint, Defendant Brown handled the questioning, made the arrest, and conducted the search of Mr. Frederick's person. (Compl. ¶¶ 46, 48, 49, 51, 56, 59-61, 63, 64, 67-69; but see id. ¶ 77 (alleging that all named RCSO Deputies arrested Mr. Frederick "individually or jointly and in concert").) Mr. Frederick does not allege any acts or conduct by other deputies that would support a false arrest claim against them.[17] City of Huntsville, 608 F.3d at 737 (stating "[m]erely being present with arresting officers at the scene is not enough" to establish the requisite causal connection between the government actor's acts or omissions and an unconstitutional arrest, unless the plaintiff can show the other officers present were "part of the chain of command authorizing the arrest action"). Accordingly, the Court **DISMISSES WITH PREJUDICE** Mr. Frederick's § 1983 claims for false arrest (Count V) against Defendants Hamrick, Hardin, Saal, and Swint. The Court considers these Defendants' purportedly unlawful actions *after* the arrest in its

---

[17]    The Court acknowledges that the allegations against Defendant Hardin — that post-arrest Mr. Frederick "was given to . . . Defendant Hardin" and she took him to the car for transport to a holding area (Compl. ¶¶ 70-72) — present a closer question, but nonetheless finds them insufficient to suggest personal participation *in the arrest*.

discussion of Mr. Frederick's excessive force claim. That leaves only Defendant Brown here.

The crime for which Mr. Frederick purportedly was arrested — violating the Ordinance (Compl. ¶ 59) — is defined as follows: "It shall be unlawful for any minor under the age of eighteen (18) to loiter, wander, stroll or play in or upon the public streets . . . unsupervised by an adult having the lawful authority to be at such places, between . . . 12:00 midnight and 5:00 a.m. on the following day." AUGUSTA-RICHMOND COUNTY CODE § 3-1-2. "[T]he provisions of this section shall not apply in the following instances: (a) When a minor is accompanied by his or her parent, guardian, or other adult person having the lawful care and custody of the minor; . . . [or] (d) When the minor is attending or traveling directly to or from an activity involving the exercise of first amendment rights of free speech, freedom of assembly or free exercise of religion." (Id.) At bottom, the curfew has three essential elements: it operates on a (1) defined class — unsupervised minors, (2) in defined places, (3) at defined times.

The RCSO Deputies argue that "[Mr. Frederick] does not dispute the fact that he was walking downtown after curfew, and, upon review of his Complaint, neither Plaintiff nor anyone who was supposedly accompanying him *demonstrated* he was being accompanied by a parent, guardian, or other adult person . . . at the time the Defendants spoke with him. This being the case, officers and deputies in the RCSO Deputies' position could have reasonably

56

believed that [Mr. Frederick] had violated the [Ordinance]." (RCSO Defs.' Br. at 15 (emphasis added).) Mr. Frederick responds that "[t]he necessary elements to show a violation of the . . . Ordinance[] include that the minor is 'unsupervised by an adult,' *and* the absence of exceptions . . . ." (Pl.'s Resp. RCSO at 4 (emphasis added).) He continues, "the Defendant officers possessed reasonably trustworthy information that Plaintiff was supervised by an adult, Brad Tucker, and no information to the contrary." (Id. at 5.) "In essence, if Defendant Officers believed that Plaintiff was 'unsupervised by an adult,' then they made an objectively unreasonable mistake of fact and are not entitled to qualified immunity." (Id.)

The Court does not agree with Mr. Frederick. As described above, an officer needs only arguable probable cause to be eligible for qualified immunity. Skop, 485 F.3d at 1137. Thus, the Court considers whether a reasonable deputy, knowing what Defendant Brown knew at the time, objectively *could have believed* probable cause existed. The facts, when viewed in the light most favorable to Mr. Frederick, are that Mr. Frederick was walking on Broad Street near Tenth Street at a time when the Ordinance was triggered. (Compl. ¶¶ 39, 41.) Defendant Brown reported that "he saw a large group of 'black male subjects' . . . yelling and chanting" (id. ¶ 46), "another deputy had a spotlight" on that group (id. ¶ 48), and he later saw Mr. Frederick "try to separate himself" from the

spotlight and "throw something on the ground" (id. ¶ 55).[18] Once the RCSO deputies confronted the crowd, Mr. Frederick "appeared to be a minor to [them]." (Id. ¶ 44.) Deputy Brown first grabbed Mr. Tucker and asked if he was over 18. (Id. ¶¶ 51, 53.) Next, Mr. Frederick, responding to the same question, admitted to Defendant Brown that he was 16-years-old. (Id. ¶¶ 56, 57.) Upon informing Mr. Frederick of his arrest, Mr. Tucker then *volunteered* that "he was an adult and that he was with [Mr. Frederick] and he was in charge of him." (See id. ¶¶ 45, 53, 58-60.) Defendant Brown, however, encouraged Mr. Tucker to leave and "refused to listen" to him. (Id. ¶¶ 54, 61, 62.) Beyond this exchange, there are no allegations that Mr. Frederick made an attempt to affirm Mr. Tucker's statements or to provide Defendant Brown with proof of Mr. Tucker's authority (id. ¶ 12) as a chaperone. Neither Defendant Brown nor any other deputy went to the source: no one asked *Mr. Frederick* during the course of his arrest if he "was with anyone

---

[18]     Mr. Frederick does not dispute Defendant Brown's report about the group's activities as a whole (see id. ¶ 50), but does deny that *he* was yelling and chanting (id. ¶¶ 47, 169). Mr. Frederick also does not dispute that he separated himself from the group, instead opining in the Complaint that "[s]eparating oneself from persons who are yelling is not criminal or delinquent activity." (Id. ¶ 50.) Critical to the Court's analysis is that Mr. Frederick has not presented any facts that would make Defendant Brown's report or account of the incident, as alleged, inherently unreliable. See Kingsland v. City of Miami, 382 F.3d 1220, 1233 (11th Cir. 2004) (explaining that qualified immunity will not protect officers whose conduct "creates factual issues to their honesty and credibility"). Rather, Mr. Frederick only offers two conclusory statements that Defendant Brown "created false evidence" about throwing something on the ground and that Mr. Frederick had been yelling. (Id. ¶¶ 168, 169; see also id. ¶ 131.) Moreover, these "disputed" facts may speak to the reasonableness of the RCSO deputies' initial stop of Mr. Frederick and the young men with whom he fraternized on the night in question, but Mr. Frederick asserts no such claim in this case.

over 18 or being supervised by anyone over [18]." (See id. ¶¶ 45, 58, 59, 94, 97, 100.)

Examining these alleged facts from the viewpoint of the deputies at the time the events occurred, the Court concludes that Mr. Frederick's actions — walking down the main thoroughfare of downtown Augusta after curfew with a group of teenage males who were acting raucously, separating himself from that group upon law enforcement's pursuit, and then admitting he was underage — could have indicated to an objectively reasonable officer at the scene that Mr. Frederick was violating the curfew Ordinance, even if those circumstances were insufficient to prove an actual violation of § 3-1-2. See City of Huntsville, 608 F.3d at 736; Scarbrough, 245 F.3d at 1303 n.8; Benjamin v. City of Miami, No. 14-22800-CIV, 2015 WL 1043671, at *3 (S.D. Fla. Mar. 10, 2015) (finding the plaintiff's complaint demonstrated the existence of probable cause to arrest where he was detained blocks away from the crime scene, allegedly fit the general description of the assailant, and one victim identified the plaintiff as the possible assailant, notwithstanding that the identification may have been mistaken); McKally v. Perez, No. 14-22630-CIV, 2015 WL 758283, at *5 (S.D. Fla. Feb. 6, 2015) (finding "reasonable officers who observed McKally driving with a suspended license, and heard McKally admit his license had previously been suspended but not explicitly repudiate knowledge of the new suspension charge" could have believed probable cause existed to carry out the arrest); Bloom v.

<u>Miami-Dade Cnty.</u>, 816 F. Supp. 2d 1265, 1277 (S.D. Fla. 2011), aff'd sub nom., <u>Bloom v. Alvereze</u>, 498 F. App'x 867 (11th Cir. 2012).

The fact that Defendant Brown did not credit or listen to Mr. Tucker's statement that he was an "adult in charge" *as evidence of supervision*, considering the totality of the circumstances alleged,[19] or conduct a more thorough investigation at the time of arrest does not divest him of probable cause. See <u>Sirmons</u>, 307 F. App'x at 358 (holding that "[g]enerally, in determining probable cause an arresting officer does not have to consider the validity of any possible defense," with the exception of circumstances in which "the arresting officer *actually* has knowledge of facts and circumstances *conclusively establishing* an affirmative defense") (emphasis added) (citations omitted); <u>Williams v. City of Homestead, Fla.</u>, 206 F. App'x 886, 888-89 (11th Cir. 2006) (per curiam) (agreeing with the Sixth Circuit's finding that "while a police officer should consider a suspect's explanation in evaluating the existence of probable cause, he 'is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially

---

[19] That is, Mr. Frederick was walking after midnight with a boisterous group of males in their mid to late teens, separated himself from that group when the deputy Defendants began to follow the group with a spotlight, appeared to the deputy Defendants to be a minor, and then admitted to being 16; and Mr. Tucker spoke up, claiming he was "in charge," but only after Defendant Brown threatened Mr. Frederick with arrest.

discovered provide probable cause'" (quoting Criss v. City of Kent, 867 F.2d 259, 263 (6th Cir. 1988))); Kingsland, 382 F.3d at 1228-29 ("[A] police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." (quoting Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997))); Rankin v. Evans, 133 F.3d 1425, 1435-36 (11th Cir. 1998) (stating that an arresting officer is only required to conduct a "reasonable investigation" to establish probable cause, and "it is not necessary to eliminate all possible defenses") (citations omitted); Benjamin, 2015 WL 1043671, at *3 (citing Vickers v. Georgia, 567 F. App'x 744, 747 (11th Cir. 2014) and Hendricks v. Sheriff, Collier Cnty., Fla., 492 F. App'x 90, 94 (11th Cir. 2012)).

Mr. Frederick counters that the deputy Defendants failed in their "affirmative duty to investigate" before arresting Mr. Frederick: they "heard the assertions of . . . [Mr.] Tucker that [Mr. Frederick] was accompanied by an adult," and if they disbelieved Mr. Tucker, they should have, at minimum, asked questions of Mr. Frederick to ascertain whether the "necessary element[s] of the alleged crime [were] present." (See Pl.'s Resp. RCSO at 8-9.) Although it is true, as Mr. Frederick asserts, that law enforcement "may not conduct an investigation in a biased fashion[,] . . . elect not to obtain easily discoverable facts[,]" or "turn a blind eye to immediately available exculpatory

information,"[20] the Court still finds that Defendant Brown could have believed based on the information before him, *notwithstanding who accompanied Mr. Frederick*, that Mr. Frederick was not "supervised."[21] Whether such a term devises too much discretion to law enforcement officers is relevant, if at all, only to Count I.[22]

---

[20] _Gray v. City of Roswell_, 486 F. App'x 798, 801 (11th Cir. 2012)(citing _Kingsland_, 382 F.3d at 1229 & n.10)(holding officers did not have probable cause to arrest the plaintiff for criminal damage to property and therefore were not entitled to qualified immunity at the motion to dismiss stage because the complaint raised an inference that the officers had reason to believe the plaintiff's accuser was not providing "reasonably trustworthy information" and investigation into the accuser's claims only required the officers to ask the accuser to show them the damaged property, which they did not do); _see_ _also_ _Kingsland_, 382 F.3d at 1229 (finding genuine issues of material fact precluded a finding that probable cause existed to arrest the plaintiff for driving under the influence of marijuana because (1) it was within the police officer's knowledge that the plaintiff sustained injuries to her head, had been crying, and explicitly faulted an off-duty officer for running the light, and (2) the plaintiff presented evidence that the police officer elected not to obtain other easily discoverable facts, such as whether there was cannabis in the truck or whether witnesses were available to attest to who was at fault in the accident); _Carter_, 2015 WL 3477022, at *14 (finding genuine issues of material fact existed as to probable cause, arguable probable cause, and whether a police officer acted in good faith when he ordered the plaintiffs' arrest for trespass in light of evidence that the plaintiffs and non-parties repeatedly attempted to provide the officer with proof of a property management company's authority to secure the officer's former home for foreclosure and the officer refused to review the authorization letter or verify the plaintiff's authority to be at the property notwithstanding the contact information provided to him).

[21] In a footnote, Mr. Frederick also argues that the Complaint gives rise to the inference that Mr. Frederick fell under the Ordinance's "First Amendment exception" "because he was traveling from or attending First Friday, and because he was with his cousin, Brad Tucker. Plaintiff, when arrested, was exercising his First Amendment right to freedom of association, specifically his right to make 'choices to enter into and maintain certain intimate human relationships,' that is[,] to be with his cousin while engaged in protected strolling and loitering along with other attendees of the public assemblage." (Pl.'s Resp. RCSO at 4 n.5.) Mr. Frederick's sparse argument is on shaky legal footing.

First, the Constitution does not recognize "a generalized right of 'social association.'" _City of Dallas v. Stanglin_, 490 U.S. 19, 25 (1989). "'[F]reedom of speech' means more than simply the right to talk and to write. It is possible to find some kernel of expression in almost every activity a person undertakes — for example, *walking down the street or meeting one's friends at a shopping mall* — but such a kernel is not sufficient to bring the

activity within the protection of the First Amendment." <u>Id.</u> (emphasis added).

Nor does the addition of Mr. Tucker to the equation transform Mr. Frederick's activity into the type of "intimate association" that the First Amendment was meant to protect. The Court has long recognized that the "freedom of association" is designed to secure individual liberty in the "formation and preservation of certain kinds of highly personal relationships" that "cultivat[e] and transmit[] shared ideals and beliefs" or enrich one's ability to define his identity. <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 618-19 (1984) (citations omitted). But the personal affiliations and interests that exemplify such considerations include marriage, childbirth, the raising and education of children, cohabitation with one's relatives, and membership in a group. <u>Id.</u> at 619-20 (citations omitted). Mr. Frederick's allegations do not implicate these fundamental liberties or anything similar thereto.

Moreover, there is no suggestion that Mr. Frederick and Mr. Tucker were "in pursuit of . . . political, social, economic, educational, religious, and cultural ends" or sought "to speak, to worship, [or] to petition the government for the redress of grievances." <u>See id.</u> at 622; <u>see also</u> <u>City of Dallas</u>, 490 U.S. at 24 (citing <u>Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte</u>, 481 U.S. 537, 548 (1987)). The Supreme Court has been unwilling to extend protection of the freedom of association outside situations where it relates to First Amendment purposes. <u>See</u> <u>City of Dallas</u>, 490 U.S. at 25, 28. Thus, in addition to the fact that Defendant Brown was not required to eliminate all possible defenses prior to Mr. Frederick's arrest, of which the "First Amendment exception" is one, the Court finds that Defendant Brown reasonably could have concluded that Mr. Frederick was not engaged in any expressive or associative First Amendment activity on the night in question: as Mr. Frederick puts it, he merely was "loitering and strolling" with a group of unnamed young men, and in any case, there is no allegation that Defendant Brown was aware that Mr. Frederick and Mr. Tucker were related. (Pl.'s Resp. RCSO at 4 n.5.)

[22] The Court recognizes the tension between its decision to permit Count I to proceed, subject to Mr. Frederick's ability to establish standing, and its dismissal of Mr. Frederick's false arrest claims, which purportedly arise out of the RCSO Defendants' enforcement of the same potentially unconstitutional Ordinance. Even if the Court found the Ordinance to be unconstitutional, the Court would hold that Defendant Brown's conduct in arresting Mr. Frederick for violation of that Ordinance did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known," <u>Harlow</u>, 457 U.S. at 818; <u>see also</u> <u>Michigan v. DeFillippo</u>, 443 U.S. 31, 38 (1979) ("Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality — with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.") The Court has not found — and Mr. Frederick has not presented — a single decision in place at the time of Mr. Frederick's arrest in 2010 by the Supreme Court, the Eleventh Circuit Court of Appeals, or Georgia's highest court that addresses the constitutionality of juvenile curfew ordinances. Mr. Frederick's reliance on a 1997 case decided by the Ninth Circuit Court of Appeals, <u>Nunez v. City of San Diego</u>, 114 F.3d 935 (9th Cir. 1997), although

In light of the stated observations, reported in Mr. Frederick's complaint, the Court cannot find that Mr. Frederick has alleged that a reasonable officer in Defendant Brown's position would have known that Mr. Frederick's arrest on that date for violation of curfew was unconstitutional. Defendant Brown did not violate Mr. Frederick's constitutional rights, and he therefore is entitled to qualified immunity from individual liability. With such findings, the Court need not consider the second prong of qualified immunity.

Moreover, because there was arguable probable cause for Mr. Frederick's arrest under the Ordinance, the First Amendment claim Mr. Frederick appends to Count V must also fail,[23] as does Count VII, which alleges Defendant Brown "caused an unreasonable arrest"

---

addressing a juvenile curfew ordinance with language virtually identical to that of the Augusta Ordinance, cannot clearly establish the law for purposes of qualified immunity in this case. See Merricks v. Adkisson, 785 F.3d 553, 559 (11th Cir. 2015) (citing McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007)); Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011); Marsh, 268 F.3d at 1032 n.10. Mr. Frederick does point to Bullock v. City of Dallas, 281 S.E.2d 613 (Ga. 1981), as clearly establishing the principle that language like "shall remain or loiter" is constitutionally infirm on vagueness and overbreadth grounds (Doc. 34 at 7-8), but Mr. Frederick's Complaint focuses exclusively on the Ordinance's supervision component. (See Compl. ¶¶ 33, 34, 38, 45, 58, 60, 89, 90, 91, 93, 94, 96, 97, 98, 102, 103, 107, 109-11.) A Complaint may not be amended by briefs. See Huls v. Llabona, 437 F. App'x 830, 832 n.5 (11th Cir. 2011); McKally, 2015 WL 758283, at *6 (citing cases). As Mr. Frederick is represented by counsel, he is not entitled to a liberal construction of the Complaint that would encompass his challenge to the Ordinance's use of "loiter, wander, stroll, or play."

[23] "[A] validly arrested Plaintiff does not have a First Amendment claim, even if he was exercising his First Amendment rights at the time he was arrested." Owaki v. City of Miami, 491 F. Supp. 2d 1140, 1155 (S.D. Fla. 2007) (citing Redd v. City of Enterprise, 140 F.3d 1378, 1383 (11th Cir. 1998) ("When a police officer has probable cause to believe that a person is committing a particular public offense, he is justified in arresting that person, even if the offender may be speaking at the time that he is arrested.")).

when he "created false evidence" about other potential offenses. The Court thus **DISMISSES WITH PREJUDICE** Mr. Frederick's § 1983 claims asserted in Counts V and VII against Defendant Brown.

### 6. Official Immunity for Individual Capacity Claims

Mr. Frederick's four, unlabeled state law claims cite nine separate provisions of the Georgia Code and Constitution, alleging in wholly conclusory fashion and without factual support that the RCSO Defendants are liable for abusive arrest (Compl. ¶ 181), "intentionally caus[ing] or attempt[ing] to cause Plaintiff physical injury" (id. ¶ 185), intentional infliction of emotional distress (id. ¶¶ 187-89), and false imprisonment (id. ¶ 191). Mr. Frederick merely incorporates the preceding allegations of the Complaint by reference and fails to allege which facts, if any, support which claim for relief. Notwithstanding these challenges, the RCSO Defendants formulated an answer and now move to dismiss the state law claims on grounds of official immunity. (See RCSO Defs.' Br. at 18 (summarizing Mr. Frederick's state law claims).)

State employees are entitled to official immunity from suit and liability unless they perform their discretionary duties "with actual malice or with actual intent to cause injury in the performance of their official functions." GA. CONST. art. I, § II, ¶ IX(d); Gilbert, 452 S.E.2d at 483. Thus, "[u]nlike qualified immunity under federal law, [the Court] must inquire into [the officer's] *subjective* intent to determine whether he has official

65

immunity under Georgia law." <u>Kopperud v. Mabry</u>, 573 F. App'x 828, 833 (11th Cir. 2014) (third alteration in original) (emphasis added) (citing <u>Jordan v. Mosley</u>, 487 F.3d 1350, 1357 (11th Cir. 2007)).

For purposes of official immunity, "actual malice" means "express malice, i.e., a deliberate intention to do wrong." <u>Murphy v. Bajjani</u>, 647 S.E.2d 54, 60 (Ga. 2007). "A 'deliberate intention to do wrong' such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs." <u>Id.</u> It does not include willful or wanton conduct or the reckless disregard for the rights and safety of others. <u>West v. Davis</u>, 767 F.3d 1063, 1073 (11th Cir. 2014) (citing <u>Murphy</u>, 647 S.E.2d at 60); <u>Bagwell v. Hall Cnty.</u>, No. 2:14-CV-00195-RWS, 2015 WL 1919956, at *6 (N.D. Ga. Apr. 28, 2015) (citing <u>Daley v. Clark</u>, 638 S.E.2d 376, 386 (Ga. Ct. App. 2006)). Mere proof of ill will, anger, frustration, or irritation is also insufficient. <u>Adams v. Hazelwood</u>, 520 S.E.2d 896, 897-98 (Ga. 1999); <u>Woodward v. Gray</u>, 527 S.E.2d 595, 600 (Ga. Ct. App. 2000).

Because the parties do not dispute that the deputy Defendants were engaged in a discretionary function at all times pertinent to the state law claims,[24] we consider only whether the deputy

---

[24] Mr. Frederick failed to respond to the RCSO Defendants' argument on this issue (RCSO Defs.' Br. at 12), which indicates that he does not oppose dismissal on these grounds. <u>See</u> LR 7.5, SDGa. Nevertheless, Georgia courts consistently have held that "the decision to effectuate a warrantless arrest generally is a discretionary act requiring personal judgment and deliberation on the part of the officer." <u>Reed v. Dekalb County</u>, 589 S.E.2d 584, 587 (Ga.

Defendants acted with actual malice. The Court finds that Mr. Frederick has not alleged sufficient facts to meet this standard. His state law claims, as presented, are devoid of *any* well-pleaded facts, save *maybe* one,[25] about Mr. Frederick *or* the deputy Defendants individually. The Court will not sift through the entire Complaint to decide for itself which facts are material to the particular state law causes of action asserted. Nor will it continue to permit Mr. Frederick to cure the glaring void of factual allegations specific to his state law claims by argument in brief. Accordingly, in this case, the deputy Defendants are entitled to official immunity from Mr. Frederick's claims and must be **DISMISSED**.

7.  <u>Substitution of Sheriff Roundtree in his Official Capacity</u>

As the Court mentioned in its consideration of Mr. Strength's motion to dismiss, Federal Rule of Civil Procedure 25(d) dictates that Sheriff Roundtree "is automatically substituted as a party" for Mr. Strength in those claims alleged against him in his official capacity. Relevant to this substitution would be Claims II, III, and IV (federal claims) and Count IX (state law claim). The Court has determined, however, that Sheriff Roundtree is

---

Ct. App. 2003); <u>Anderson v. Cobb</u>, 573 S.E.2d 417, 419 (Ga. Ct. App. 2002) (accord).

[25] The only allegation that the Court possibly could construe as being "factual" in nature states: "Plaintiff suffered severe emotional distress in the form of depression and distrust of authority, and fear that his race will result in other arbitrary harmful action in the future, causing sever [sic] and prolonged emotional distress." (Compl. ¶ 189.)

entitled to Eleventh Amendment immunity for claims asserted against him in his official capacity under federal law. The Court also determined that the deputy Defendants are entitled to official immunity with respect to Mr. Frederick's state law claims. Mr. Frederick's claim that Sheriff Roundtree is vicariously liable for the deputies' conduct, therefore, must also fail.

Mr. Frederick asserts that Sheriff Roundtree in his official capacity "should be left in the case as a defendant for purposes of potential injunctive or declaratory relief." (Pl.'s Resp. RCSO at 15.) Such relief cannot arise from the remaining claims, which consist solely of excessive force and equal protection violations against the deputies in their individual capacities, as well as his facial challenge against Augusta. For these reasons, Sheriff Roundtree shall be terminated as a party.

## IV. CONCLUSION

For the reasons stated herein, the Court **GRANTS IN PART** Defendant Augusta, Georgia's Motion to Dismiss. (Doc. 21.) Only Count I **SHALL PROCEED**, subject to Mr. Frederick's ability to prove that he has standing. (See Doc. 46.)

The Court also **GRANTS** Defendant Ronald Strength's Motion to Dismiss on all grounds. (Doc. 12.) The Court **DIRECTS** the Clerk to **TERMINATE** Mr. Strength as a party in this matter, as well as all deadlines and motions pertaining to him.

Finally, the Court **GRANTS IN PART** the RCSO Defendants' Motion to Dismiss (Doc. 35) and **ORDERS** the following:

1. Any and all claims asserted against Lieutenant Gay are **DISMISSED** from this case. The Court **DIRECTS** the Clerk to **TERMINATE** Mr. Gay as a party in this matter, as well as all deadlines and motions pertaining to him.

2. Any and all claims asserted against John Doe and Jane Doe are **DISMISSED** from this case. The Court **DIRECTS** the Clerk to **TERMINATE** them as parties in this matter, as well as all deadlines and motions pertaining to him.

3. Any and all claims asserted against Sheriff Roundtree in his individual capacity are **DISMISSED** per Mr. Frederick's stipulation that he does not assert any such claim. Mr. Frederick's official capacity claims against Sheriff Roundtree are also **DISMISSED** as barred by Eleventh Amendment immunity or for failure to state a claim. The Court **DIRECTS** the Clerk to **TERMINATE** Sheriff Roundtree as a party in this matter, as well as all deadlines and motions pertaining to him.

4. Any and all claims asserted against the deputy Defendants in their official capacities are **DISMISSED** from this case as barred by Eleventh Amendment immunity.

5. Any and all state law claims (Counts IX, X, XI, XII) asserted against the deputy Defendants are **DISMISSED** from this case as barred by official immunity.

6. Count V, as asserted against the deputy Defendants in their individual capacities, is **DISMISSED** from this case as insufficiently pleaded (with respect to Defendants Hambrick, Hardin, Saal, and Swint) and otherwise barred by qualified immunity (with respect to Defendant Brown).

7. Mr. Frederick's equal protection claim (Count VI) against the deputy Defendants in their individual capacities **SHALL PROCEED**.

8.   Count VII, as asserted against Defendant Brown in
     his individual capacity, is **DISMISSED** from this case
     as barred by qualified immunity.

9.   Mr. Frederick's discrete excessive force claim
     (Count VIII) against the deputy Defendants in their
     individual capacities **SHALL PROCEED**.

Augusta, Georgia **SHALL** have **FOURTEEN DAYS** to file an answer to

Mr. Frederick's Complaint.   The remaining parties **SHALL** submit a

discovery plan to the United States Magistrate Judge within **THIRTY**

**DAYS** of the date of this Order.

    **ORDER ENTERED** at Augusta, Georgia, this /0ᵗʰ day of August,

2015.

                                    _____
                                    HONORABLE J. RANDAL HALL
                                    UNITED STATES DISTRICT JUDGE
                                    SOUTHERN DISTRICT OF GEORGIA